ANTON PAULSON, Appellee, v. STATE HIGHWAY COMMISSION, Appellant.

No. 40200.

JUNE 23, 1930.

*John Fletcher*, Attorney-general, *Maxwell A. O'Brien*, and *Gerald Blake*, Assistant Attorney-generals, *T. J. Mahoney*, and *F. Hollingsworth*, for appellant.

*Dyer, Jordan & Dyer*, for appellee.

FAVILLE, J.—Appellee owns two separated tracts of land, extending from the Des Moines River northeastwardly more than a mile, to the city of Boone, and intersected by and abutting on the primary road in question, as it was, and as it is by the proceedings before us changed. A tract next to the river contains 63 acres, and is separately improved. On this tract appellee had his residence until 1917. In 1915, appellee acquired about 45 acres nearer Boone, to which he added, from time to time, various tracts, all now connected with each other, and aggregating 170

acres. On one of these tracts, one mile from the 63 acres, is an elaborate set of farm buildings, including a commodious residence, into which appellee moved in 1917. The land is operated for stock raising and dairying. Appellee usually has 75 hogs and 75 to 100 head of cattle, including about 25 milch cows. He uses the two tracts of land in conjunction, and also rents other land for his stock business. Both of said tracts are primarily adapted to stock raising and dairying. The only means of access between the 63 acres and the 170 acres is the highway in question, and the nearest points of access are about one-half mile apart. A small oblong tract of the 170 acres projects southwardly from the main body, and is about one fourth of a mile from the 63 acres; but this oblong tract did not abut upon the highway until the change now under consideration was made. The highway prior to the change ran from the river irregularly northeastwardly to a point some 300 or 400 feet south of appellee's present main buildings, at which point it turned to the east, leaving the buildings on the north side of the highway. Appellee's yards and pasture were mainly west and southwest of the buildings, and not separated from them. By the change the highway leaves the river at a point farther north than formerly, and runs in a fairly uniform northeastwardly direction in the direction of the north line of the 170 acres. Instead of turning eastwardly south of the buildings, it now continues northeastwardly west of the buildings, and within 100 feet of them, separating them from a large part of appellee's feed lots, as well as from the pasture and the cultivated land. The highway as thus changed passes over land the surface of which in its natural state was badly broken, but the highway over which is graded, resulting in cuts and fills between the buildings and the remnant of the lots and the pastures. There is a cut through the feed lot, 15 feet deep.

The 63-acre tract has about 20 acres of cultivated land and 43 acres of pasture. It has upon it a house, two barns, and (as stated in argument) other buildings. The 170-acre tract has upon it between 70 and 80 acres of farm land, and the balance is pasture. Appellee testifies:

"I keep the cattle west of the barn. I had a lot there,—before it was condemned, I think it was an acre or an acre and a half. * * * The lot was pretty dry before the road was put

through. I also had used it for threshing, and kept my straw stacks there when filling silos. We can just get in there now,— that is all. We cannot work as many teams and wagons there as we did before. I have no other place on the other side of the silos where we could work, or for threshing. The cut * * * is 15 feet deep, went through my present lot. The right of way is 110 feet wide at that point. Before the new road went through, I used the land north of the feed lot for alfalfa. The highest part of it is now on the west side of the new right of way, and I can't use it for that purpose. The piece north of the little alfalfa piece was used for stock hogs. I can't use that for that purpose now. * * * It laid north and west through that little ravine, and ran out into the pasture. It was all one piece of ground, fenced off. They can get down to it now through a kind of tunnel. It is, I think, three by four feet. It is not level. * * * It is between 55 and 60 feet long. When the water freezes, the hogs slide through. I have to drive them back over the highway. * * * The water runs through most of the time. * * * The ground immediately north of this culvert, which used to be pasture for stock hogs, I used for farming, before the road went through,— about 15 or 20 acres. The road cuts it in two. The way the new highway was built makes a difference in the way I have to do my farm work. All point rows on one side of the highway. * * * Most of the pasture land lies south and west of the buildings. Before the condemnation, all I had to do was open the barn gate, and they could go out and in all over the 100 acres. There were no cross fences there. Since the new road has been built, I have to take them out past my house, go out on the Lincoln Highway, down the road a little west, and put them in the pasture. * * * The grade that was built and the fill fixed it so they cannot get across. * * * About an acre or two of the pasture is on the east side of the fill; practically all is on the other side. The highway commission did not provide me any way to get back and forth. There is no cattle pass. * * * Haven't got any water supply in the pasture. * * * Before the road was put through, I did not keep my cattle in the barn on hot summer nights. I turned them out in the pasture again. Since the road was put through, I turn them in the barn lot. I did that because it was too far to drive them, and too dangerous, over the highway. Before the highway was put in, they came up at milking time, mostly by themselves.

I now drive the cattle down there and bring them back at night. I sometimes had to take them home to water at noon, during dry weather. * * * I drive the cattle about 150 feet along the new highway. The highway is busy,—about 500 to 2,000 cars pass, a day. This place is on a grade in the highway. Before the grade was put in, * * * the cattle * * * came up to the barn lot to drink, where I had a tank. Since the highway has been put in, gravel and dirt wash down in the pasture. * * * Most of the road is straight. Some of it is on a curve. * * * The pasture land I have is hilly. I used the barns on the 63 acres to let the cattle run in on nights when they are in the cornstalks. That is the only use I make of the barns there. * * * The only basis I had for arriving at the $200 an acre value * * * was what it would produce for me. I have only lost about four acres of cultivated land since the new road went through. * * * It is about 200 feet from my city water to the pasture. * * * About 150 or 200 feet down to the level where the cattle would come for water to the foot of the hill. If I put in lead pipe, it would cost about a dollar a foot, and one dollar a rod for the digging. The new road didn't affect the land up on the top of the hill, that I cultivate. My getting to this land was not affected by the building of the new highway. * * * I based my answer on the difference in value of the farm before and after taking, in part on the fact that I have to drive my cattle back and forth across the highway. I don't know how much it would cost to put in a cattle pass on my barn lot under the highway west of my pasture. I could probably put water across the pasture for $350 or $400. * * * I probably did not pay more than $25,000 for all my farm, and put improvements on it, * * *. As far as the 63-acre tract is concerned, the new highway does not affect it, except that it takes off a little corner, amounting to sixteen hundredths of an acre. The little corner was a part of the hill. It was in the pasture land, not the cultivated. Of the 6.62 acres taken for the road, I figured the farm land was worth $300 to me, and the pasture land $100. About four acres was cultivated land, the rest pasture. * * * Damage to the 63-acre tract would be about $6.25 [$16.25?].''

Appellee was asked what was the fair and reasonable market value of the land, and answered, ''$46,800.'' He was then asked

what was the fair and reasonable market value of the same land immediately after the condemnation, and answered, "$23,400."

The court instructed the jury as follows:

"It is shown by the evidence in this case that the plaintiff, Anton Paulson, is now, and has been for some time past, the owner of approximately 273 acres of land. * * * The measure of damages to which the plaintiff is entitled is the difference between the fair and reasonable market value of the farm owned by plaintiff, taken in its entirety, immediately before * * * and immediately after * * *"

This instruction was erroneous. In view of the situation of the two tracts of land owned by the appellee, and their use, as shown by his evidence, it was a question for the jury to determine whether or not the farm was a single and entire farm, for the purpose of estimating the damages.

In *Ellsworth & Jones v. Chicago & Iowa W. R. Co.*, 91 Iowa 386, we considered a situation involving separate tracts of land, and, in view of the fact situation disclosed in that case, we said:

"* * * we are of the opinion that whether the entire tract should have been considered as a whole, or portions of it separately, in estimating the damages, were questions of fact, which should have been submitted to the jury."

See, also, *Hoyt v. Chicago, M. & St. P. R. Co.*, 117 Iowa 296, 300; *Westbrook v. Muscatine, N. & S. R. Co.*, 115 Iowa 106.

In *Peden v. Chicago, R. I. & P. R. Co.*, 78 Iowa 131, we said:

"It has been frequently determined that, where a right of way through parcels of real estate treated as an entirety—as, for example, tracts together constituting but a single farm—is sought to be taken by statutory proceedings, the landowner's right of recovery is not limited to the subdivision through which the right of way is to pass, but extends to all the tracts as a whole."

To the same effect, see *Ham v. Wisconsin, I. & N. R. Co.*, 61 Iowa 716.

Under the record in this case, notwithstanding the fact that

the tracts are not contiguous, it was a question for the determination of the jury as to whether or not the land was so used and operated as one farm that the damages should be assessed to said farm as an entirety, or to each of the tracts separately. The instruction to the jury was to the effect that the farm must be treated as one farm, of 273 acres, and the damages assessed to it as such. This was error. The court should have submitted to the jury the determination of the question as to whether or not the farm was used as one farm, so that the damages did result to it as an entirety, or whether it was in such separate tracts that the damages should be assessed to each tract separately. The court should also then have submitted to the jury the proper measure of damages, for them to apply, in accordance with their finding on this fact question.

The court erred in submitting the question to the jury in the manner in which it did, and because thereof the case must be reversed.—*Reversed.*

STEVENS, KINDIG, WAGNER, and GRIMM, JJ., concur.