ARKANSAS STATE HIGHWAY COMMISSION
*v.* WILLIAM J. DEAN ET AL

5-4269                                        425 S. W. 2d 306

Opinion delivered March 18, 1968

*John R. Thompson* and *Phillip N. Gowen*, for appellant.

*Clark, Clark & Clark* and *Guy H. Jones*, for appellees.

J. FRED JONES, Justice. This is a condemnation case arising out of the construction of Interstate 40 through Conway, in Faulkner County, Arkansas. By right of eminent domain, the state highway commission condemned a right-of-way across property belonging to appellees on the outskirts of Conway. Judgment was entered by the Faulkner County Circuit Court on a jury verdict of damages in favor of the appellees in the amount of $41,-500.00, and the commission has appealed.

Appellant has designated the following points relied upon for reversal:

"The trial court erred in refusing to disqualify himself, and in refusing to quash the jury panel.

The trial court erred in refusing to give plaintiff's (Appellant's) requested Instruction No. 10.

The trial court erred in refusing to give plaintiff's (Appellant's) requested Instruction No. 8."

The record before us reveals the following facts: Prior to 1957, a study was made by the Arkansas Highway Department of a route for Interstate 40 Highway through Faulkner County. A proposed route east of Conway was surveyed and traced on county maps in 1956, and this route was recommended when the study was completed in 1957. In 1958, the proposed highway and the proposed route through Conway were discussed by officials of the highway department with the citizens of Conway at a public Chamber of Commerce meeting. Following this meeting, the Children's Colony north of Conway requested a change in the proposed alignment of the highway in order to miss some of the improvements at the Colony, and this change was made. The final survey for the alignment of the highway was completed in 1959, and the county and city maps, showing the proposed designated route, were brought up to date. In 1963, strip maps of the proposed highway right-of-way were furnished to Mr. Ott, a title abstracter in Conway, and on the basis of these maps he furnished re-

quested title information to the highway department on land along the proposed route. About February 1, 1964, the highway department started gathering sales information and making actual appraisals of the property to be condemned. The center line stakes for Interstate 40 were finally set by the highway department in February 1965, and actual negotiations for the purchase of right-of-way from the owners along this route were commenced in May 1965.

When the highway department actually started negotiating with property owners for the purchase of rights-of-way, other negotiations had already been under way for some time for highway *frontage* along the same route staked out by the highway department. On January 21, 1965, Continental Oil Company had taken three separate options to purchase nine lots adjacent to the right-of-way for the total price of $85,000.00. In January or February 1965, appellees were negotiating for the purchase of 47 acres of the land involved in this case from C. T. Ray, and Mr. Ott was their chief competitor. Mr. Ott was successful in obtaining an option to purchase this land for $137,500.00. On March 11, 1965, Pure Oil Company took an option to purchase from Mr. Ott, 12.9 acres of this land extending 1185 ft. along the right-of-way line of Interstate Highway 40, for the purchase price of $110,000.00, and Mr. Ott warranted to the Oil company that the exact description of the land involved was to be as described and *as shown on attached strip map prepared by the highway department.* Then on March 31, 1965, Mr. Ott exercised his option to purchase from Ray, and on the same day sold this land to appellees for $10,000.00 more than he paid Ray for it. The sale from Ott to the appellees was subject to the option held by the Pure Oil Company.

As to this purchase, appellee Henry testified:

"In either late January or early February, 1965, Mr. Dean and I began negotiating with Mr. Ray to

buy his property. We were finally successful in buying it, but not from Mr. Ray. We had to buy it from Mr. Bob Ott, because Mr. Ray had sold it to Mr. Ott. In talking to Mr. Ott about it, Mr. Ray told him that we were interested in it too. He told us there was an option on this 13 acres on the west side to Pure Oil Company for $110,000.00, that he had signed it and he gave me a copy of it, * * *.

Q. Mr. Henry, do you know anything about the Ott purchase of the Ray property—what has been referred to as the Ray property?

A. Yes, sir.

Q. Did he purchase that under contract first and then get a Deed, or how was it, or do you know?

A. I believe he had an option at first.

Q. To buy it from Mr. Ray?

A. Yes.

* * *

Q. Do you know that this option preceded Mr. Ott's option to Pure Oil?

A. Yes, sir. It did.

Q. And then subsequent to optioning it to Pure Oil, the property was then deeded to him. Is that correct?

A. Yes, sir.

Q. And on that very same day he deeded it to you and Mr. Dean?

A. Yes, sir.

* * *

Q. Did you know how much Mr. Ott had paid for the property when you purchased it?

A. Yes, sir, we sure did."

The Ray property, which appellees purchased from Ott, lies on both sides of the right-of-way line for Interstate 40. The main body of this tract is square in shape and was landlocked except for a strip containing eight or nine acres, less than two city blocks in width and about two blocks in length, extending south from the southwest corner of the main body to Highway 64. All of this strip is west of Interstate 40 right-of-way. Immediately east of the main body of the Ray tract, Helen R. Collier owned a 39 acre tract of land. This land lies in an approximate square shape and joins the Ray tract along the west side of the Collier tract. The Collier tract lies north and east of the Interstate 40 right-of-way and north of Highway 64. It was landlocked by the Ray tract on the west and by other land on the other three sides and was without access to Highway 64. The interchange right-of-way from U. S. 64 to Interstate 40 cuts across the southwest corner of the Collier tract and the right-of-way continues from where it crosses (overpasses) Highway 64 in a northwesterly direction and diagonally through the Ray tract.

Prior to March 1965, the highway department started negotiating a contract for the purchase of this right-of-way from Helen L. Collier. The contract was first made for the purchase of this right-of-way on May 11, 1965, and although this contract was dated February 16, 1966, it was proofread on March 2, 1965. On April 5, 1965, following the purchase of the 48 acre tract from Mr. Ott by appellees, Mrs. Collier offered to sell to appellees for $500.00 (later raised to $600.00) per acre that portion of her 39 acre tract which she had not already agreed to sell to the highway department. On this point Mr. Henry testified:

"A. ***We went out there and talked to her, and she told us what she would sell us and what she would sell it to us for.

Q. And what did she say?

A. She said, 'I'll sell you the back part, everything that's north of the highway stakes.'

Q. Everything that's north of the highway stakes for Interstate 40?

A. Yes."

Appellees purchased this Collier tract for $600.00 per acre and the deed was delivered on May 14, 1965. Negotiations for purchase of rights-of-way were suspended by the highway department on May 13, 1965, and the landowners were advised of the suspension on May 14. The highway department later resumed negotiations for the purchase of right-of-way and finally closed the transaction with Mrs. Collier on March 2, 1966, by paying her $62,150.00 for 8.15 acres actually taken for right-of-way.

As to appellant's first point, there was some evidence in the record to the effect that the trial judge owned an interest in property subject to condemnation for Interstate 40 right-of-way in a separate action, and appellant contends that he should have disqualified in the trial of the case at bar. There also was some evidence that newspaper articles had been published pertaining to the trial judge's interest in similar litigation in another case in which he did disqualify, and appellant contends that the jury panel should be quashed. There was no evidence, or anything else, on either of these points abstracted by the appellant, as required by Rule 9 (d) of this court, so we find no error in the trial judge refusing to disqualify in the present case and in refusing to quash the jury panel.

We dispose of appellant's third point, as to its instruction No. 8, before considering its second point. Appellant's requested instruction No. 8 is as follows:

"You are instructed that the defendant had a duty to minimize the damages that they might sustain by

virtue of the taking by the Highway Commission, and to that end you are instructed that if you find that certain acts could have been done, or certain arrangements could have been made by the defendants that would have lessened the damages suffered by the defendants, then they are not entitled to claim those elements today, and you will disregard any element of damages claimed by these defendants for such items as they might have corrected or eliminated."

In connection with their proof on severance damages, appellees offered evidence that the cost of extending a sewer line across the right-of-way from appellees' property on the west and south side of Interstate 40 to their property north and east of Interstate 40, would be considerably more ($540.00 per acre) since the construction of Interstate 40 than it would have been before actual construction, and this evidence was submitted to the jury along with the other evidence of damage. This additional cost was in connection with driving or "jacking" a conduit under the highway without interfering with the use of the highway. There was also evidence offered by appellant that the Children's Colony did, and the appellees could have, mitigated this cost by constructing the conduit for a sewer across the right-of-way after it was acquired and before actual construction was begun, thus greatly mitigating their damages on this item. We conclude that under the evidence on this point, appellant's instruction No. 8 should have been given and that the trial court erred in refusing it.

The appellant's second point has given us considerable difficulty and no little concern. Appellant's requested instruction No. 10 was as follows:

"You are instructed that in your deliberation you are not to consider the property known as the Collier tract, either so far as damages are concerned, or as benefits are concerned, said tract being pur-

chased by the defendants with knowledge of the fact that the possible taking by the Highway Commission would leave the Collier Tract without access and cut off.''

A great deal of the testimony was directed to the question of whether or not the appellees knew that the highway would be built across their land when they purchased it. They more or less admit that they knew that some of their land would be landlocked by the highway if it was built in the place it was built, but they deny that they *knew* where the highway would be built when they purchased their land.

On this point Mr. Henry testified:

''Q. And when did you say you got the Deed to the Ray property?

A. On March 31, 1965.

Q. Was your transaction with Miss Collier a one day affair, or had you previously agreed to purchase the property from her?

A. It took over a month to wind up the transaction.

Q. So that actually you had agreed to purchase it at some time prior to the actual date the Deed was delivered, is that right?

A. That's right.

Q. Mr. Henry, in Opening Statement counsel for the Highway Commission stated this property was purchased with your knowledge that the highway would go through there. Will you tell us what knowledge you had at the time you purchased this property of any location of this Interstate 40?

A. I had no knowledge whatever of any definite location. I knew that a number of surveys had been run, but from general knowledge.''

Common sense is not to be completely abandoned by a trial jury, a trial judge, or this court on appeal, in estimating the extent of knowledge derived from established facts and circumstances.

If Mr. Ott did not *know* where Interstate 40 would be built when he took his option from Mr. Ray, he obviously *thought he knew* when he warranted its location in the option he sold to the Pure Oil Company on March 11, 1965, and subsequently assigned to appellees.

Appellee, Ray, testified that he knew there had been other property purchased by the highway department for right-of-way for Interstate 40 both north and south of the property he purchased from Mr. Ott before he purchased the property from Ott. Appellees purchased the Ray tract from Ott subject to the Pure Oil Company option (with the strip map attached). They knew that Mrs. Collier was only selling "everything that's north of the highway stakes for Interstate 40" when they purchased it. So it is obvious to us, from the record in this case, that if appellees did not *know* Interstate 40 would cross their land when they purchased it, they were certainly unreasonable if they assumed that it would not.

In the recent case of *Arkansas State Highway Commission* v. *Griffin*, 241 Ark. 1033, 411 S. W. 2d 495, we adopted the general rule from *Nichols on Eminent Domain*, Third Edition, 1962, Volume 4, Section 12.3151, pages 201-204, stated as follows:

"The general rule is that any enhancement in value which is brought about in anticipation of and by reason of a proposed improvement is to be excluded in determining the market value of such land, although there is some authority which, contrariwise, unqualifiedly allows recovery for such enhanced value."

In the Griffin case we then said:

"While, as pointed out, there is some authority to the contrary, we like the logic of the general rule, and align ourselves with those who have adopted that view."

In arriving at the true value of land taken and the damages to the land not taken, both sides, the landowner and the condemnor, obtain the services of readily available professional appraisers, all of them well versed in the three appraisal methods, all of them using the same approach, most of them licensed realtors of long experience, and all of them experts in land values.

Appellees argue that by constructing Interstate 40 across the 47 acre tract they purchased from Ott, the appellant has damaged their remaining property outside of the right-of-way in that the part of the 47 acre tract north and east of Interstate 40, and all of the 39 acre tract purchased from Collier, have been severed from that portion of the 47 acre tract lying south and west of Interstate 40, and from access to sewer connection and to Highway 64 at the southwest corner of the 47 acre tract. These were principal elements the expert witnesses took into consideration in arriving at the'r conclusions of $91,650.00 overall *damage* as testified by appellees' expert, Mr. Barnes, and $44,600.00 *enhancement* in value as testified by appellant's expert, Mr. Adams. This leaves a difference between the opinions of these two expert witnesses in the actual amount of $135,250.00 on these two pieces of property purchased for $170,900.00. Such variance in the opinion of experts on the value of real property simply does not make sense, and only points up the unreliable nature of expert opinion on real property appraisals.

Witness Barnes testified for appellees that he compared twenty-five comparable sales with appellees' land and arrived at a value at the time of taking of $265,000.00 and $173,350.00 after the taking, or a difference of $91,-650.00 as just compensation. This figure was broken

down to $26,357.00 as the value of the land actually taken and $65,293.00 for damages to the remainder. The residual damage as testified by Mr. Barnes consisted of $1,000.00 per acre severance damages to the residuals consisting of $260.00 for loss of access to Highway 64, $540.00 for additional cost of extending utilities and $200.00 for distortion of plottage.

According to Mr. Barnes' testimony, the building of the highway left appellees' property worth only $2,-450.00 more than they paid for it, but $91,650.00 less than it was actually worth. According to his testimony the 39 acres in the Collier tract, which was bounded by Interstate 40 right-of-way when appellees purchased it, had been damaged by the construction of the highway $400.00 more per acre than the appellees paid for it.

Appellee, Dean, valued the property at $265,000.00 before the taking and at $150,704.00 after the taking, leaving a difference of $114,196.00 as damage to the property. According to Mr. Dean's testimony, the market value of this land when he purchased it was $94,-100.00 more than he paid for it and that its market value was more than half destroyed by building the highway. He estimates that by building the highway his land is now worth $20,196.00 less than he paid for it and $114,-296.00 less than it was actually worth.

Twenty-five comparable sales were used by the expert witnesses in arriving at the value they placed on the land. No one testified as to the dates or amounts of these sales and no questions were asked as to the dates or prices paid, so we accept the land values, including that placed on the Collier tract, as correct. The residual or severance damage to the tract, however, is another matter. It is obvious to us that appellees knew, or certainly believed, that Interstate 40 would be built exactly where it was built when they purchased all of the Collier tract east of the right-of-way, and added that tract to the tract they purchased from Ott.

When appellees purchased the Collier tract, they only purchased "the back part . . . north of the highway stakes for Interstate 40." They were bound to have known what portion of this tract Mrs. Collier had agreed to sell to the highway department, and they were bound to have known that the Collier tract was landlocked when they purchased it and would remain so when Interstate 40 was completed across the tract they purchased from Ott.

The Kentucky Court of Appeals had a very similar case before it in *Commonwealth* v. *Raybourn,* 359 S. W. 2d 611. In that case Raybourn owned a motel on a .38 acre tract of land abutting on old Highway No. 60. They learned that the highway was to be changed and they purchased a 1.72 acre tract contiguous to their first tract and through which the new highway was to pass. Right-of-way was taken across the second tract by eminent domain. Treating the two tracts as a unit, the trial court awarded damages in the amount of $5,000.00 for the right-of-way taken in fee and $32,500.00 resulting damages to the remainder. In reversing the judgment of the trial court, the court of appeals said:

"We therefore hold that when it has been proven that the owner of property, on which land is being taken by the power of eminent domain, has purchased such property with knowledge of that fact, he is not entitled, for the purpose of assessing damages, to have it considered a part of other property previously acquired by him."

There is no substantial evidence in the record before us that the Collier tract of land purchased by the appellees east and north of Interstate 40 was damaged at all by the construction of Interstate 40. We conclude that appellant's instruction No. 10 should have been given under the evidence submitted at the trial of this case, but since this case must be remanded for a new trial for error in refusing to instruct the jury on mini-

mization of damages as requested in appellant's instruction No. 8, we are unwilling to say that the Collier tract, as a matter of law, should be completely eliminated from consideration by the jury under proper instructions and under any and all circumstances that may arise at the re-trial of this case. For the errors indicated, this case is reversed and remanded to the Faulkner County Circuit Court for a new trial.

Reversed and remanded.

BYRD, J., not participating.

FOGLEMAN, J., concurs.

JOHN A. FOGLEMAN, Justice, concurring. I concur in the result but am compelled to dissent from a part of the court's action. In my opinion, the majority holding that appellant's requested Instruction No. 10 should have been given has, in effect, changed the law of eminent domain and has created a dilemma for property owners, whose rights as such have been declared higher than constitutional sanction.

This instruction would have foreclosed, as a matter of law, any consideration of the Collier tract by the jury because of a *"possible taking by the Highway Commission."* [Emphasis mine] It would have also prevented the jury from determining a factual question on disputed testimony, assuming that the instruction was otherwise proper. I cannot bring myself to agree with the propriety of either effect which would result from the giving of this instruction.

While the result in this particular case might seem to some to be an appropriate one, I cannot help remembering that we are not only deciding cases, but are also establishing precedents. This precedent, I submit, is a dangerous one. It will permit condemnors to announce a proposed project far in advance, make some plans, run some surveys and sterilize the real estate which

might be affected. Then, when values are sufficiently depressed by reason of the inhibition of sale or development, the condemning agency may actually take the right-of-way, easement, or property needed and pay "just compensation" at the depressed price. Or, the condemnor may, at its own option, change its plans and leave a landowner with undeveloped property that might have been fully developed and utilized if the project had never been planned. The result reached by the majority makes the proposal of a highway through an owner's lands an incumbrance thereon and a virtual confiscation.

Appellant's real contention is that a 39-acre tract known as the Collier tract could not be considered, for the purposes of this case, to constitute a unit composed of it and the Thorpe tract. The basis of its contention is that the Collier tract was purchased by appellees with knowledge that appellant would, when it did condemn this right-of-way for Interstate Highway No. 40, cause this tract to be landlocked. I submit that this is erroneous if declared as a matter of law. If appellees did not purchase the Collier tract in good faith for the purpose of consolidating lands formerly held under separate ownerships as a unit for future development, but for the sole purpose of enhancing their damages to other lands remaining after the taking, they should not recover. But their knowledge and their motives should have been questions of fact for the jury and not determined as a matter of law as Instruction No. 10 would have done and as appellant argues should be the case. It should also be noted that Instruction No. 10 is based on appellees' knowledge of the *possibility* of a taking, not the *certainty* thereof. This in itself is erroneous.

The Thorpe tract of 47 acres was purchased by appellees from Robert L. Ott on March 31, 1965. The 39 acres were purchased from Mrs. Collier subsequently. She called appellee Henry on April 5, 1965, and appellees conferred with her. On the following day they en-

tered into a purchase contract with her, even though she raised her price $100 per acre over that she asked the preceding day. The transaction was not closed until May 14, 1965, when a deed was delivered to appellees. No proceedings for the taking of the highway right-of-way were instituted until June 6, 1966.

Appellant introduced evidence to show that the 1957 Arkansas recommendation for the Interstate System included a location for what is now known as Interstate Highway No. 40, east of Conway near its present location. It showed that a public meeting was held in Conway in 1958 to determine the economic impact of the highway location. In 1959, the proposed location was altered slightly at the request of the Arkansas Children's Colony. Appellant's witnesses say that they corresponded with the Conway Planning Commission about the location in 1962. It was 1963 before title work was started with Robert L. Ott, an abstractor. Appellant's evidence tended to show that the right-of-way was staked out in 1964. It was not until 1965 that negotiations with landowners for right-of-way were started, and it appears that appellant was only taking options at that time. It is undisputed that these negotiations were suspended in May 1965 and were not resumed until late 1965.

Appellee Dean is manager of the Steel Chevrolet Company. He said that he became interested in obtaining a new location because of problems of his company. He was looking for land from 1961 to May 1965. The purchase was made with the idea that his company would use a location on Highway No. 64 bordering the land. At the time of the purchase, Pure Oil Company had an option on a portion of the land purchased from Ott, but released it October 19, 1965. Dean said that Pure Oil Company released the option because it was unable to determine whether there would be a highway there. Dean and Henry testified about their efforts to pin down the location of the highway right-of-way. Hen-

ry testified that he was City Attorney and attorney for The Conway Corporation, a concern that operates the city light, water and sewer systems under lease. Neither the city nor the company had been given any specific information as to the location of the highway, to his knowledge. After the representative of the Pure Oil Company advised Dean that the option was released because he had been to Little Rock and found that the location of the highway was undetermined, Dean and Henry went to Little Rock to see the Director of Highways. About November 3, 1965, they conferred with the Director and Mr. Henry Gray, the head of the Right-Of-Way Department. According to appellees, they were advised that these officials did not know where the highway was going. Previously, on May 3rd, 4th, or 5th, 1965, an attorney for appellant had given Henry a strip map showing a general location of the highway and lands which would be traversed by it. The map bore a stamp carrying these words in capital letters: "DATA SHOWN IS PRELIMINARY AND ROUTE IS SUBJECT TO CHANGE." This notation was pointed out by the Highway Department attorney, who remarked that the map was preliminary, not final. Henry says that on May 18, 1965, four days after an announcement by the Highway Department that it was stopping negotiations for right-of-way, the same attorney was in Conway to settle a suit and Henry asked what they were going to do. He says that the attorney said: "They're going west."

In November or December 1965, Dean and Henry went to Searcy to see Truman Baker, one of the Highway Commissioners. Baker advised, according to appellees, that the Commission was still studying the matter and might go east or west of Conway. Later in December, appellees went to Clarksville to see Armil Taylor, another Highway Commissioner, and found that he would not tell them anything. It was not until a conference with the Director of Highways, the Chief Engineer, the Chief of the Right-Of-Way Division and a repre-

sentative of the Bureau of Public Roads in the spring of 1966 that they were told the highway would go through on the previously proposed route. It was not until April of 1966 that a highway department representative came to them to try to acquire right-of-way.

William B. Young, a representative of Gulf Oil Company who took options along the right-of-way for his company, was called as a witness by appellant. He testified that he took two options on December 3, 1965. One of them was executed by Robert L. Ott. It contained a clause making the option contingent upon preliminary plans for Interstate Highway No. 40 being approved by the Bureau of Public Roads and the right-of-way being acquired according to appellant's survey. The option would be rendered void if the highway were relocated. The options were not exercised until August 5, 1966. He said that he used the Highway Department as a source of information as to highway location and that on the date he took the options this location was indefinite. His company wanted to carry the matter into 1966 to be sure that its option was on the highway.

The Continental Oil Company also put a clause in its options dated January 21, 1965, extending them until the Highway Department had published its final plans.

None of the testimony of appellees about the uncertainty of the highway location disclosed to them is seriously contradicted. The Assistant Director of the Right-Of-Way Division said that no alternate route was ever seriously considered. None of the persons from whom appellees sought information testified. It is interesting to note, however, that the Chief of the Right-Of-Way Division testified at a pre-trial conference that at the time a certain newspaper article appeared in Conway on May 15, 1965, a "little" consideration was being given to a change in highway route. He said it was thought that the alignment might be moved to satisfy some people who were disgruntled about right-of-way. He said

that there was serious consideration of a change at the administrative level and by the Commission, but that when the amount of money already invested in the previous alignment was considered, a decision to proceed on the preliminary route was made before any new surveys were ordered. He admitted telling landowners that "temporarily we were not going to do anything out there." He also said that he told landowners with whom negotiations had been conducted that, temporarily, appellant would not give them letters of acceptance or contracts of sale and would not take possession in the immediate future.

The time for which the market value of property is to be determined is the date of taking. The right to deal with property until that time is absolute, and a deprivation of that right constitutes a violation of due process of law, in my opinion. I think that the correct rule in cases such as this is stated in *Krier* v. *Milwaukee Northern Ry. Co.*, 139 Wis. 207, 120 N. W. 847 (1909). There was evidence in that case that the owner purchased the property shortly before the partial taking with knowledge of the probability thereof. The jury was instructed that they were not to consider whether the owner or his grantor had knowledge as to when the railroad line in question was to be located. In affirming the action of the trial court, it was said:

"A person has the undoubted right to buy or improve realty in the face of a probability that it may be invaded, as in this case. To do so is not evidence of bad faith. Furthermore, the property owner owes no duty to the prospective appropriator to consider its interests in what he shall do with his own. Whether, in any given case, he proceeds with the idea that the value of improvements made in the face of probable appropriation will enhance the damages he will contingently suffer or not, has nothing to do with the abstract question as to his right to full compensation if appropriation occurs. It is his con-

stitutional right to buy, hold and improve property as he sees fit and rely upon the fundamental guaranty that, to the extent he shall be deprived thereof under the power of eminent domain, he will, as a condition precedent, receive a full equivalent.''

It should be kept in mind that it is the taking of property for which compensation is made, not the proposed taking or the contemplated taking.

In *Driver* v. *The Western Union Railroad Company*, 32 Wis. 569, 14 Am. Rep. 726 (1873), the landowners acquired their property after commissioners had been appointed at the request of the railroad company to estimate the value of property to be taken and damages to other lands. The property consisted of four lots. They were bought for the building of a factory and mill. The railroad crossed one corner of Lot 7 under license. After the contract of purchase, but before title was taken, the owners were notified that the railroad would need Lot 7 and a representative sought to negotiate for the lot. In spite of this, the owners completed their mill. When Lot 7 was taken, they claimed depreciation in value of the other three lots by reason of the taking of Lot 7. The railroad company contended that the jury should not consider the use to which the owners had put the property or the effect of the taking of the lot upon that use. The following statements of the court in rejecting that contention are most appropriate here:

"* * * And if the company neglected to exercise the right of eminent domain and acquire the property, it certainly could not insist that the owner should not use or improve it until it actually condemned it under its charter. Nor were the owners bound to await the action of the company, but could make their improvements in view, of course, of the contingency that a portion of the property might be taken for railroad purposes. But upon what principle it can be said the owners had no right to im-

prove their property and build their factory, even though the consequences might be to enhance the damages which the company would be compelled to pay when it finally condemned a portion of the land, we are at a loss to understand. There is no ground for saying that the plaintiffs proceeded in bad faith, and made an expensive improvement merely for the purpose of enhancing the damages which the company would have to pay. They improved their property as they had a perfect right to do, and when the company proceeded to condemn lot 7 under its charter, the plaintiffs insisted that it should pay the damages to the adjoining premises resulting from the taking of this lot for railroad purposes. It seems to us that the claim is a just and proper one; fully sustained by the spirit and language of the charter.

\* \* \*

\* \* \* But what could the plaintiffs do? They desired to improve and use those lots for their factory. True, they knew that the company had instituted proceedings to condemn lot 7, but those proceedings were wholly under the control of the company. The company might abandon them at any time before the commissioners made their award. The only thing they could do was, either to await the action of the company, which might neglect, as it had for years, to condemn the property, or to go on and improve and use it in that way which seemed most for their interests. And when the company should take any portion of such property for the use of its road, they might well rely upon the constitution and the charter for securing them compensation for all damages thereby occasioned. It is said they went forward with their eyes open, and, if they are subjected to inconvenience for the want of suitable room for the prosecution of the business of their mill, it is their own fault. The answer to all this is, that the plaintiffs had the legal and moral right to use and improve their property, and if the

necessities of the company for the use of lot 7 were such that it could afford to pay them the damages resulting from its acquisition, then the company could acquire it by the proper proceedings. But we fail to see any ground for imputing to the plaintiffs any negligence or wrongful use of their own in what was done by them.''

There is a very close analogy here to cases arising where an owner has made improvements on property after he has either been notified or has information that his property will be taken through eminent domain. The general rule in this regard is well stated at 27 Am. Jur. 2d 105, Eminent Domain, § 294, as follows:

''As a general rule, knowledge of the fact that a public improvement is proposed which will result in the taking of his land does not deprive an owner from recovering the value of buildings subsequently erected, since even though preliminary steps have been taken, the making of the contemplated improvement may be abandoned, and it would be highly unjust to deprive an owner of the right to make in good faith the best use of his property except at his peril.''

The rule is elaborated on somewhat in 4 Nichols on Eminent Domain 381, § 13.14:

''There has been considerable discussion of the practice of 'planting' buildings upon land expected to be taken for the public use with the intention of making a claim for damages when the taking occurs. Merely because an owner of land is aware that a public improvement has been proposed which will result in the taking of his land, he is not to be deprived of the right to recover the value of buildings subsequently erected. It would be highly unjust to deprive an owner of the right to make the best use of his property except at his peril merely because

it lies in the path of one of the many public improvements which are so often discussed and projected without being actually consummated for many years. In this view it has been held that even though the improvements were in an incomplete state at the time of the initiation of a condemnation proceeding but were completed prior to the time that title actually vested in the condemnor, the owner was entitled to the full value of such improvements.''

In *State* v. *Carragan,* 36 N. J. 52 (1872), a landowner had been denied compensation because he erected buildings on the line of a street laid out by map and bridge commissioners as a part of a scheme for streets and avenues, the opening of which depended on a variety of circumstances. In reversing, the court said:

''We do not think, while the opening of the street was thus in abeyance, the land owner was deprived of the right to use his property in any lawful manner. To so hold would be in substance to allow a taking of private property for public use without making just compensation therefor. If the improvements should be made in bad faith, with intent to throw an undue burden on the public, another element would enter into the consideration of the question, which might perhaps produce a different result. There is however no such question in this case.''

Statutes denying compensation for buildings erected after the filing of a map of a proposed street across the land on which they were erected, even though condemnation proceedings have not been commenced, have been held unconstitutional. *Edwards* v. *Bruorton,* 184 Mass. 529, 69 N. E. 328 (1904); *Forster* v. *Scott,* 136 NY 577, 32 N. E. 976, 18 LRA 543 (1893); *Moale* v. *Mayor,* 5 Md. 314, 61 Am. Dec. 276 (1854).

The reasons given for holding these acts unconstitutional are appropriate here. For example, the Maryland court, in *Moale* v. *Mayor, supra,* said:

"* * * Under these two acts, those of 1817 and 1838, a person for an indefinite space of time may be deprived of the use of his property, because it lies on the bed of a street designated on the plot of the city, and eventually find that whilst he has paid taxes, and been denied the advantages to which he was entitled from the proper use of his land, that the street laid down on the plot has been abandoned. Such a state of things is repugnant to every notion of justice and cannot obtain our consent."

In *Forster* v. *Scott, supra,* where a prospective purchaser declined to purchase the property on the basis that the filing of the map showing a proposed street constituted an encumbrance, the New York court said:

"* * * Whenever a law deprives the owner of the beneficial use and free enjoyment of his property, or imposes restraints upon such use and enjoyment that materially affect its value, without legal process or compensation, it deprives him of his property, within the meaning of the constitution. All that is beneficial in property arises from its use and the fruits of that use, and whatever deprives a person of them deprives him of all that is desirable or valuable in the title and possession.

* * *

As the plaintiff in the case at bar was virtually deprived of the right to build upon his lot by the statute in question, and as this circumstance obviously impaired its value, and interfered with his power of disposition, it was to that extent void as to him, and created no incumbrance upon it."

In *Edwards* v. *Bruorton, supra,* the Massachusetts court said:

"* * * This was intended to prevent any use of property inconsistent with the plan after the filing

of a plan and before the laying out of a way. If it could have that effect it might materially interfere with the use which an owner might desire to make of his estate for many years, after the filing of a plan and before the laying out of a way. The statute prescribes no compensation for this interference with private property. The Legislature cannot constitutionally so interfere with the use of property without giving compensation to the owner.''

A statute which would have denied compensation to an owner or occupier who erected a building or made any improvements within the limits of any proposed highway, after the width and lines thereof had been designated, approved by the Governor and recorded in the office of the recorder of deeds was recently held unconstitutional by the Pennsylvania Supreme Court. *Commonwealth Appeal*, 422 Pa. 72, 221 A. 2d 289 (1966).

The court there said:

''All of these facts indicate, at least, extremely careless procedures by the Department of Highways. They could, at most, indicate an actual condemnation as appellees claim. While we are not unmindful of the maxim that things are what they are, not what they are said to be, we nevertheless hestitate to impute an exercise of the power of condemnation to the sovereign under the circumstances here of a longstanding practice not considered to be a 'taking' and of somewhat ambiguous statutory procedures. Rather, we believe it best to leave both parties as they began: the Commonwealth having done nothing to effect a 'taking' and appellees having full right to do whatever they wish with their property without detriment to their right to damages if the Commonwealth subsequently 'takes' their property.''

There is also a close analogy to the planting of crops on lands, even after a petition for condemnation

has been filed but before the condemnor has become bound by the taking by paying compensation or otherwise. When this is done by an owner or tenant in good faith, and not with the sole purpose of enhancing damages, recovery of the value of such a crop destroyed or damaged by the condemnor upon actual taking is allowed. 27 Am. Jur. 2d 105, Eminent Domain, § 294.

A lessee, with notice of the fact that a railroad line had been located over ·the leased lands, was held to be entitled to recover for destruction of his crops by the entry of the railroad company on the premises. *Lafferty* v. *Schuylkill River East Side R. Co.,* 124 Pa. 297, 3 LRA 124 (1889). There the court said:

> ''The reason for this is that it may be months or even years after the location of the line before the company will be ready to enter upon the land for purposes of construction or to take the steps necessary for the assessment of damages, and the owner has a right to remain in possession until actual appropriation of his land by the company. This was held in *Gilmore* v. *Pittsburgh Railroad Company,* 104 Pa. 275, and has been recognized in other cases.''

Of course, if the owner's sole purpose is the enhancement of his damages upon a subsequent condemnation, he should not recover for such improvements. 27 Am. Jur. 2d 105, Eminent Domain, § 294; 4 Nichols on Eminent Domain 383, § 13.14.

Although there are cases holding that good faith is not material [e. g., *Briggs* v. *Labette County,* 39 Kan. 90, 17 Pac. 331 (1888); *In Re Baychester Avenue,* 105 NYS 241 (1907)], I think there is no doubt but what the good faith of the owner is material and should be considered in determining whether his actions were motivated by his desire to make the best use of his property and not to enhance his damages.

The question whether two adjoining lots or tracts shall be treated as one in a condemnation proceeding is

one of fact, unless the undisputed evidence as to their use and situation is such as to leave no room for different views upon the question. *In Re Queen Anne Boulevard,* 77 Wash. 91, 137 Pac. 435 (1913); *Pittsburg, C. C. & St. L. Ry. Co.* v. *Crockett,* 182 Ind. 490, 106 N. E. 875 (1914); *Paulson* v. *State Highway Commission,* 210 Iowa 651, 231 N. W. 296 (1930); *Rath* v. *Sanitary Dist. No.* 1 *of Lancaster County,* 156 Neb. 444, 56 N. W. 2d 741 (1953).

In the present background, this statement of the Supreme Court of Indiana in *State* v. *Stabb,* 226 Ind. 319, 79 N. E. 2d 392 (1948), is appropriate:

"Appellant's tendered instruction No. 16 was to the effect that in an action involving damages to property it is the duty of the party claiming damages to mitigate or lessen damages by reasonable action rather than to increase the same; and that if the appellees, with knowledge of appellant's intent to acquire the property in question for the construction of a highway, did or performed acts that would tend to increase the amount of the damages, then any damages flowing from such acts could not be recovered. Appellant insists this instruction should have been given for the reason that the evidence discloses that the retail store was closed from 1942 until the spring of 1946, and that it was reopened only after appellees had been approached by the appellant with reference to the procuring of the property on which the store was located for the construction of the highway. All this evidence discloses is that appellees had knowledge of the fact that a public improvement was proposed which would result in the taking of their land. Such knowledge did not deprive the appellees of the right in good faith to make the best use of their property. 18 Am. Jur. Eminent Domain, § 256. There is not the slightest evidence of bad faith on the part of the appellees in so reopening their store."

In considering the factual situation here, it must be remembered that the purchases of the Thorpe and Collier tracts were virtually simultaneous.

Since appellant did not submit an instruction which permitted appropriate questions of fact with reference to the acquisition of the Collier tract to be determined by the jury, the action of the trial court was not error, in my opinion.

While I do not agree that there was no substantial evidence of damage to the Collier tract (treated as a part of a unit with the Thorpe tract), the significance of the lack of such evidence in relationship to the giving of appellant's Instruction No. 10 escapes me. That instruction is based upon purchase of the tract "with knowledge of the fact that the possible taking by the Highway Commission would leave the Collier tract without access and cut off." Upon retrial, if there should be a lack of evidence of any damage to the Collier tract as a part of the unit or a lack of evidence that the two tracts constituted a unit, the giving of the instruction might be harmless error, but I cannot conceive of its being a correct instruction because of the reason given therein. We should not indicate that the instruction should be given if the evidence is the same upon a retrial.

I further do not subscribe to the statement in the majority opinion as to the unreliability of expert testimony, even though there are often wide ranges which are difficult to harmonize.

I concur in the holding that a landowner is required to take any reasonable step to minimize damages to his remaining lands and in the absence of specific objections pointing out error in the wording of Instruction No. 8 itself, that it should have been given.