ARKANSAS POWER AND LIGHT COMPANY
v. Cleo J. MELKOVITZ and Martha A.
MELKOVITZ, His Wife; Herbert C. RULE and
Elizabeth D. RULE, His Wife; and
Robert J. CONRAD, Trustee of THE PRUDENTIAL
INSURANCE COMPANY OF AMERICA

CA 83-145                                        668 S.W.2d 37

Court of Appeals of Arkansas
Division II
Opinion delivered April 4, 1984
[Rehearing denied May 2, 1984.]

92

*House, Jewell, Dillon, Dover & Dixon, P.A.,* by: *Donald H. Henry,* for appellant.

*David Hodges* and *Henry Hodges,* for appellees.

GEORGE K. CRACRAFT, Judge. In January 1979 Cleo Melkovitz and Martha, his wife, and Herbert C. Rule and Elizabeth, his wife, purchased a 439 acre tract of land in Lonoke County. In August 1979 Arkansas Power and Light Company brought this action to condemn 12.77 acres of that land for an easement for a power transmission line and, making the required deposit, entered the land on August 29, 1979. On December 27, 1982 the jury found the sum of $75,000 to be just compensation for the taking and judgment was entered. The appellant brings this appeal contending that the trial court erred in refusing to strike the testimony of appellees' expert, that the jury verdict was grossly excessive, that the trial court erred in permitting the jury to hear evidence concerning the deposit made at the time of entry, in

excluding appellant's expert witnesses from the courtroom during the trial, and in refusing to instruct the jury as to appellees' duty to mitigate their damages. We find no error.

Walter C. Estes, appellees' expert, testified that he had been engaged in extensive farming all his life and had been a real estate broker in Arkansas since 1970 and in Louisiana since 1977. He now maintains real estate offices in both states. In 1978 he had a listing to sell appellees' farm then owned by Mr. Coleman for $1250 per acre, which in his opinion after an inspection represented the fair market value. He was unable to sell the farm for Coleman and his listing expired. He took no further interest in the property until this controversy arose. He testified that he arrived at the market value at the time of taking by adjusting the $1250 per acre value he had placed on it in 1978 to current value by utilizing a percentage factor published by the government for lands in Arkansas which he had found to be accurate. He determined the value of 80 acres immediately surrounding the transmission lines after the taking at $807.50 per acre, a reduction of 50% of fair market value. He also reduced the remainder of the property by 5%, arriving at a before value of $1615.00 per acre and an after value of $1534.25 per acre. Appellant contends that although the witness gave his opinion as to these values there was no reasonable basis for it. We do not agree.

It is settled that the testimony of an expert witness should be stricken if cross-examination demonstrates that he has no reasonable basis for his opinion. *Ark. State Hwy. Comm'n* v. *Russell*, 240 Ark. 21, 398 S.W.2d 201 (1966). Appellant argues that a basis was lacking here because the expert had arrived at his value before the taking by projecting the "1978 list price of $1250 per acre and adjusted it forward to August 21, 1979 using a percentage factor published in government reports for all lands in Arkansas." He argues that the basic figure of $1250 was the asking price of Mr. Coleman and not one determined by the witness. We cannot agree because although the witness did testify with regard to the listing and the price contained in it, he testified that he had inspected the property himself and had determined that Coleman's asking price of $1250 per acre

represented the fair market value. The witness testified at length as to the criteria he had used in determining fair market value such as location, soil type, adaptability of the soil, and improvements. Additionally the witness testified to several comparable sales he had utilized in arriving at his fair market value on the date of the property before the taking. No objection was made to his use of the percentage factors published by the government in adjusting that value forward to the date of taking.

Estes testified that the value of the 80 acres immediately surrounding the transmission lines was decreased by 50% and he devalued the remaining acreage by 5%. He had taken into consideration the location, size and construction of the power line and its interruption of farming activity in the 80 acre tract. He stated that any potential purchaser of the property would take those things into consideration in determining what he would be willing to pay for the property. On cross-examination he admitted that he was not familiar with any sale of real estate in that area in which the presence of a transmission line had actually depreciated market value but was giving his "educated opinion." The appellant, relying on *Ark. State Hwy Comm'n* v. *Jensen*, 253 Ark. 795, 489 S.W.2d 5 (1973), contends that this testimony was fatally defective and should be stricken. In *Jensen* the expert gave opinion evidence on the value of property and improvements but admitted on cross-examination that he had not inspected the improvements and was not familiar with the farm prior to the taking except by casually viewing it from the highway. The court held that the expert's familiarity with the property was not sufficiently established to support his specific testimony.

The court declared that on cross-examination an expert witness should be able to demonstrate that his valuation has a foundation in fact rather than mere surmise. It did not hold, as appellant suggests, that "experience and knowledge of real estate" cannot be utilized or relied on by an expert in making appraisals. It merely holds that one cannot base an opinion on those factors alone but must demonstrate some familiarity with the property.

Estes, unlike the expert in *Jensen*, testified that he had personally inspected the property both before and after the construction of the power line and was familiar with the property in both conditions. After the power line was erected he found the efficiency of the operation would be reduced and the cost of the operation increased by its existence. Based on his experience as a farmer and former owner of a farm crossed by a power line, he testified that obstruction on the land created hazards to the operation of machinery and aircraft and would decrease the effectiveness and increase the cost of aerial application of seed, fertilizer and herbicides, and reduce crop yield.

These opinions were shared by appellee Melkovitz, an experienced farmer and industrial pilot, and by other crop dusters called to testify. Estes also testified that the location of the towers and power lines precluded the use of a pivot sprinkler system, which is now being used in lieu of irrigation in the area because of the falling of the water table. His opinion was corroborated by other expert testimony. He testified that the reduction of 5% in value to the remaining acreage was also due to the presence of the power line and reduction in productivity to the 80 acre tract which affected the desirability of buying the whole farm. He testified that these and other problems occasioned by the erecting of the power line would definitely have an effect on the willing purchaser. In his opinion a willing purchaser when offered identical tracts, one with a power line and one without, would pay more for the one without. According to Estes these problems would recur from year to year and have an effect upon the value of the property.

Appellant also relies on *Ark.-Mo. Power Co.* v. *Sain*, 262 Ark. 326, 556 S.W.2d 441 (1977) in which seven acres through a farm were condemned for an easement for a transmission line. The expert witness testified as to the difference in the market value of the farm before and after the condemnation. On cross-examination he admitted that he could not think of a single instance where a transmission line had any effect on the market value of the property. The court held that his opinion on the damages did not have a sound and reasonable basis. Here, however, the witness did

testify to the effects the erection of the transmission line would have on the sale of the property and gave his reasons for his opinion. Testimony as to fair market value of real property is not limited to sales of comparable property, but may be determined from the opinions of witnesses having knowledge of the subject and whose business or experience entitles their opinion to weight. *Ark. State Hwy. Comm'n v. Ormond*, 247 Ark. 867, 448 S.W.2d 354 (1969). Based upon his knowledge and experience both as a realtor and a farmer this witness was entitled to give an opinion as to what effect the erection of the transmission line would have on the salability of this property. Any supposed weakness in his testimony goes to the weight of the evidence or credibility of the witness and not to the admissibility of the testimony. *Fulmer v. Southwestern Bell Tel. Co.*, 9 Ark. App. 92, 654 S.W.2d 603 (1983); *Ark. State Hwy. Comm'n v. First Pyramid Life Ins. Co.*, 265 Ark. 417, 579 S.W.2d 587 (1979). We cannot conclude that the opinions expressed by this witness were without reasonable basis or that the trial court erred in not striking his testimony.

The appellant next contends that the jury's award was grossly excessive and was obviously motivated by passion or prejudice. In determining whether evidence is sufficient to support the verdict, this court will view the testimony in the light most favorable to appellees and will indulge all reasonable inferences in favor of the judgment. *Ark. State Hwy. Comm'n v. Dupree*, 228 Ark. 1032, 311 S.W.2d 791 (1958). A jury verdict will not be set aside as excessive unless it is so excessive as to indicate passion, prejudice or an incorrect application of the law applicable to the case, even though the award may appear liberal. *Ark. State Hwy. Comm'n v. Sargent*, 241 Ark. 783, 410 S.W.2d 381 (1967). Appellant contends that since the opinions of Estes and the two appellees as to value of the property had no reasonable basis the verdict should not be permitted to stand. It is settled in this state that a landowner is competent to express an opinion as to the value of his land and it is not necessary to show that he was acquainted with market value of property or was an expert on values. He is deemed qualified by reason of his relationship as owner to give estimates as to the value of what he owns and the weight of his testimony is affected

by knowledge of the value. *Ark. State Hwy. Comm'n* v. *Fowler,* 240 Ark. 595, 401 S.W.2d 1 (1966). *Ark. State Hwy. Comm'n* v. *Mullens,* 255 Ark. 796, 502 S.W.2d 626 (1973).

Appellant argues that the testimony of the two appellees was defective because they paid only $1100 per acre in January 1979 but they testified that at the time of the taking eight months later the value had risen to $1500 per acre. Both, however, testified that at the time the purchase contract was negotiated the asking price was far below what they considered to be fair market value and that it "was a bargain." There was some evidence that their grantor had knowledge of the impending condemnation and that he had reduced the price for that reason to effect a quick sale. At the time of purchase it had not been farmed efficiently and was used mainly as pasture. They both testified that they had already made extensive improvements on the property before the taking. They had improved the irrigation system with a relift by laying 3,300 feet of pipe to the 80 acre tract where the transmission lines were located. This land had not theretofore been used for rice which is its most profitable use. They had eliminated a number of roads and put them in cultivation, combined smaller fields into larger ones, and leveled other areas and made them suitable for cultivation. They both testified that by the time the condemnation proceedings had commenced they had made it a "fully mature, desirable farm" where it had been a less desirable one.

The testimony of appellee Melkovitz, who qualified as an expert farmer and crop duster, was that the taking had reduced the value of the farm by $250 per acre. He testified that the existence of the towers and wires had increased the difficulty and cost of the whole farming operation. This property was particularly well suited for growing rice, which requires aerial application of seed, fertilizer and herbicides. He stated that it was a "nightmare for an AG pilot to fly in fields where there are power lines, and as a result they will accept jobs from other farmers in preference to them." He stated in his experience this often delayed the application of chemicals beyond the critical date, resulting in ineffective application. He testified, and this was

corroborated by another agricultural pilot, that the application of chemicals should be made 20 to 40 feet above the ground and in a straight line. The presence of the power lines made this impossible because it was too dangerous to fly under the lines and the pilot would be too high to make even application. He stated that uneven aerial applications reduced yields and increased weed problems. He demonstrated this by showing photographic slides of fields where the chemicals had not been uniformly applied. Where these chemicals are not uniformly applied they must be reapplied at double expense. He stated that the problems could not be solved by flying parallel to the power lines because the towers were not in a straight line. He futher testified that the risks of liability and danger to crops of neighbors and his own was increased because when the AG planes went too high the chemicals were more likely to drift great distances and could not be controlled. Due to the location of the towers it was impossible to make any aerial application to some parts of the farm. As a result the productivity of the farm and the cost factors were greatly increased and would continue to be incurred as long as the power line remained in place. He testified to a number of other effects of the erection of the power line and of the likelihood of damage to machinery as a result and stated that all of these factors would be considered by a prospective purchaser of the property.

Appellee also testified that the water table in that area was falling and that conventional irrigation was becoming less and less feasible. Although the acquisition of pivot sprinkler systems was expensive they use one-half as much as flood irrigation and therefore were more economical. He stated that as the water table fell the area would become more and more dependent upon the sprinkler system. As a result of the erection of the power line the use of pivot systems on the field comprised of 130 acres would be prohibited and this fact would be one a purchaser would consider. Witness Estes corroborated this when he testified that:

> My experience is that buyers of rural land are usually farmers, and when they buy they try to pick out all of those things that are a hindrance to their farming

operation. I cannot think that anybody who is being a careful buyer would want to buy a farm with a transmission line on it when you could buy one exactly the same without it.

We cannot conclude from this testimony that opinion evidence of the landowners was without reasonable basis. The weight to be given to it was a matter for the jury to determine. As these opinions were founded on a reasonable and logical basis and would sustain the amount of the jury's verdict we cannot say that the verdict was grossly excessive.

The appellant next contends that the trial court erred in permitting the jury to hear evidence concerning the amount of the deposit made by appellant. The appellant at the initiation of the proceedings had deposited only $13,000. The appellant's expert testified that in his opinion the difference in fair market value of the property before and after the taking was $14,000. On cross-examination the witness was asked if he had not been working on an appraisal of the properties when the lawsuit was filed to determine just compensation. The witness answered that he had. The appellant objected and in an in chambers conference the court ruled that counsel could not inquire as to any privileged communications but that he might inquire for purposes of impeachment as to any variance in his prior appraisal or statement. The witness was then asked if he had done the appraisal work on the appellees' farm prior to the condemnation, and the witness admitted that he had and he assumed that the company had determined the amount of deposit from his report.

Q. Alright, then can you explain to me why the tender in the court on the day the complaint was filed was $13,791.60?

A. No response.

Q. And today you're telling the jury that in your opinion the just compensation is $16,000?

A. I don't make the decisions for the deposit so I can't answer for somebody else.

Ordinarily evidence of the amount deposited by a condemnor as estimated just compensation for land taken in eminent domain proceedings is not admissible in evidence. It is not admissible to contradict lower valuations by other witnesses and should be totally disregarded in fixing the award. *Ark. State Hwy. Comm'n* v. *Taylor,* 269 Ark. 458, 602 S.W.2d 657 (1980). This question was not asked for the purpose of contradicting valuations by other witnesses or establishing the valuation of the property but for purposes of impeachment. In *Ark. State Hwy. Comm'n* v. *Blakeley,* 231 Ark. 273, 329 S.W.2d 158 (1959) the court permitted such cross-examination to show a prior inconsistent statement. Here the appellee first answered that he assumed that the company determined the amount of deposit from his report. On that assumption *Blakely* would permit the continued questioning on this point for purposes of impeachment regarding an appraisal already admitted into evidence. However, here it was subsequently explained that this witness was not the only appraiser and that his appraisal might have differed from the other, which he understood was lower than his. No further questions were asked on that subject. As this evidence was allowed for the limited purpose of impeachment the trial court should have given a cautionary instruction but the burden was on appellant to ask for one. As it was not requested the failure to give it can not be complained of for the first time on appeal. *Matkin, Adm'r* v. *Jones,* 260 Ark. 731, 543 S.W.2d 764 (1976).

The appellant next contends that the trial court erred in excluding appellant's expert witnesses from the courtroom during the trial. Before the trial began there was a request made that all witnesses be excluded from the courtroom pursuant to Unif. R. Evid. 615. The court overruled appellant's motion that its expert appraiser and agricultural consultant be permitted to remain in the courtroom. The proceedings on this motion were not transcribed and the only reference to it appears at page 264 of the transcript as follows:

THE COURT: We need to put something else on the record that we forgot to do this morning that we were

*going to go back and put on the record at the first break. What was it?*

MR. HENRY: Yes sir. We objected to the court' granting Mr. Hodges' motion to remove C. V.Barnes and Bill Dortch because we felt that their testimony was going to be based on the testimony of the other witnesses in the trial and it was necessary and essential to our case.

THE COURT: The court ruled at that time that they were not essential to your case. And according to your files [sic] the exemption under 615 did not apply.

The appellant contends that the ruling of the trial court illustrates a conflict which exists between Unif. R. Evid. 615 and Unif. R. Evid. 703. Those rules are as follows:

RULE 615: *Exclusion of Witnesses.* — At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of . . . (3) a person whose presence is shown by a party to be essential to the presentation of his cause.

RULE 703: *Basis of Opinion Testimony By Experts.* — The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing.

The appellant argues that if an opposing expert witness is excluded from hearing testimony he cannot base his opinion on "the facts or data presented by those witnesses." He argues that these witnesses would have been able to learn facts and data from hearing the testimony of appellees and their witnesses to use as a basis for their opinion. Certainly if a witness is to testify, not to the facts in the case but solely in his capacity as an expert, and must use the testimony presented at the trial as the basis for his opinion, this argument would have merit. However, both of these

witnesses testified from their own independent investigations of the property before and after the taking, and stated their opinions based on those investigations.

In *Chambers* v. *State*, 264 Ark. 279, 571 S.W.2d 79 (1978) this court declared that the word "shall" as used in Rule 615 is mandatory. In *Morvant* v. *Const. Aggregates Corp.*, 570 F.2d 626 (6th Cir. 1978) the court said that where an exception to the exclusionary rule is sought under Unif. R. Evid. 615(3), it could only be based on Rule 703 which at least implies that experts will be present in court to hear the evidence. The court held, however, that the mere fact that an expert witness may be assisted by being present to hear the testimony upon which he is expected to base his expert opinion does not necessarily furnish an automatic basis for exempting him from sequestration under Rule 615(3).

Where a party seeks to exempt an expert witness from the exclusionary rule on that basis the decision is within the discretion of the trial judge, which should not normally be disturbed on appeal. *Morvant* v. *Const. Aggregates Corp.*, *supra; Miller* v. *Universal City Studios, Inc.*, 650 F.2d 1365 (5th Cir. 1981). In the absence of a record of the proceedings had on the motion we are unwilling to conclude that the trial judge abused his discretion in not exempting the experts under Rule 703. We are unable to find any indication that these witnesses intended to base their opinion on the testimony of other witnesses heard in the courtroom and would be unable or hindered in some way to give opinion tstimony if excluded. On the contrary the record indicates that the opinions of both witnesses were based on independent observations and differed from appellees' witnesses only as to conclusion.

Nor do we find error in the court's ruling that the presence of these witnesses was not "essential to the presentation of the case" as provided in Rule 615(3). In *Chambers* v. *State, supra,* our court adopted the generally accepted interpretation of that section which is that it applies "to such persons as an agent who handled the transaction being litigated or an expert needed to advise counsel in the management of the litigation." *International*

*Harvester Corp.* v. *Hardin,* 264 Ark. 717, 574 S.W.2d 260 (1978). (See 28 USCA Federal Rules of Evidence, Rule 615, Notes of Advisory Committee (1975)). In *Oliver B. Cannon & Son* v. *Fidelity and Cas. Co.,* 519 F.Supp. 668 (D. Del. 1981) the court stated that what must be shown is that a witness has such specialized expertise or intimate knowledge of the facts of the case that a party's attorney could not effectively function without the presence and aid of the witness or that the witness would be unable to present essential testimony without hearing the testimony of all other witnesses. This record does not contain such a showing.

In his testimony appellee Melkovitz stated that after the easement was taken the appellant placed three towers along an existing ditch which had been used as a border for his fields and drainage for his farm and neighboring farms. He testified that as a result of the easement he was forced to move the ditch at considerable expense and gave testimony of that expense as an element of damage. The appellant countered that testimony with another expert who testified that it was not necessary to move the ditch as a result of the border but that Melkovitz was merely proceeding with his plans to improve the farm and that it was not necessary to alleviate damages caused by A.P. & L. Relying on *Ark. State Hwy. Comm'n* v. *Dean,* 244 Ark. 405, 425 S.W.2d 306 (1968) appellant contends that it was not necessary to move it and that it was the duty of the appellee to mitigate his own damage and that the court erred in refusing to give the jury a proffered instruction on the duty of the landowner to mitigate his damages. We do not find that case controlling here. There, after property had been condemned for highway purposes and the road constructed, the landowner at considerable expense ran a conduit under the constructed highway for a sewer line across the right-of-way from the appellee's property on both sides of the road. There was evidence that the landowner could have mitigated his damages by constructing the conduit before the road was constructed. In this case the question is not whether the ditch should have been moved in a different way or at a different time but whether the power line necessitated moving the ditch at all. There was no showing that it would have cost more or less to have moved the ditch before the

power lines were constructed. The question of whether the erection of these lines necessitated the moving of the ditch was a question for the jury to determine. We find no error.

Affirmed.

MAYFIELD and COOPER, JJ., agree.