Lena V. MORVANT, etc., et al.,
Plaintiffs-Appellants,

v.

CONSTRUCTION AGGREGATES
CORPORATION,
Defendant-Appellee.

No. 76–2052.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 6, 1977.

Decided Feb. 13, 1978.

---

J. Issac Funderburk, Funderburk, Conque & Doucet, Durwood W. Conque, Abbeville, La., for plaintiffs-appellants.

Robert A. Lanier, Farris, Hancock, Gilman, Branan & Lanier, Henry H. Hancock, Memphis, Tenn., for defendant-appellee.

Before PHILLIPS, Chief Judge, and ENGEL and KEITH, Circuit Judges.

ENGEL, Circuit Judge.

Michael J. Morvant drowned in the Mississippi River near Memphis, Tennessee, on March 8, 1975, when the tugboat *Marco*, of

which he was skipper, capsized and sank, trapping him in the pilothouse.

Morvant's widow, on behalf of herself and their three minor children and as administratrix of his estate, brought an action under the Jones Act, 46 U.S.C. § 688 (1970), and under the general maritime law against Construction Aggregates Corporation as owner of the *Marco.* The complaint charged both negligence on the part of the company and its other employees and unseaworthiness of the vessel. In a jury trial a verdict was rendered in favor of the plaintiff in the amount of $58,000. She appeals, claiming that the amount awarded was inadequate and resulted from numerous errors of the district court, principally in the restrictions upon the admission of evidence concerning damages. We reverse and remand for a new trial.

## I

Plaintiff claims the trial court erred in excluding from the courtroom her expert on marine surveying. Although she intended to call the expert as a witness, she nevertheless claims he was exempt from sequestration under subsection (3) of Rule 615, Federal Rules of Evidence. Rule 615 provides:

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. *This rule does not authorize exclusion of* (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) *a person whose presence is shown by a party to be essential to the presentation of his cause.* (emphasis added).[1]

Judge Weinstein recognizes that exception 3 of Rule 615 will be most frequently invoked in the case of expert witnesses, but observes that "[t]he responsibility for demonstrating that a given witness is essential lies with the parties." 3 Weinstein's Evidence ¶ 615[01] at 615–9 (1976). *See also Varlack v. SWC Caribbean, Inc.,* 550 F.2d 171, 175 (3d Cir. 1977).

In support of her position, plaintiff now urges on appeal:

> The complicated and unusual circumstances surrounding the facts of this case and the highly technical nature of the unseaworthiness issue made the advice of an expert, on the spot, essential to the presentation of plaintiff's cause. The record clearly substantiates this contention.

The difficulty with this argument is that it was never presented to the district court. Instead, plaintiff's counsel based his request in the district court upon his desire that the expert witness hear the testimony of the other witnesses so that he could testify on the issue of causation.

■ We perceive little, if any, reason for sequestering a witness who is to testify in an expert capacity only and not to the facts of the case. As Professor Wigmore's treatise summarizes:

> The process of sequestration consists merely of preventing one prospective witness from being taught by hearing another's testimony . . . .

6 Wigmore on Evidence § 1838 at 461 (Chadbourn rev. 1976).[2] Theoretically at least, the presence in the courtroom of an expert witness who does not testify to the facts of the case but rather gives his opinion based upon the testimony of others hardly seems suspect and will in most cases be beneficial, for he will be more likely to base his expert opinion on a more accurate

---

1. As the Advisory Committee Notes to Rule 615 indicate,

 [Exception 3] contemplates such persons as an agent who handled the transaction being litigated or an expert needed to advise counsel in the management of the litigation. See 6 Wigmore § 1841, n. 4.

2. As Professor Wigmore's treatise points out, the rule excluding witnesses from the courtroom while others are testifying is one of ancient lineage and even finds a biblical antecedent in the story of Susanna and the elders. 6 Wigmore on Evidence § 1837 (Chadbourn rev. 1976); Daniel 13 (Douay).

understanding of the testimony as it evolves before the jury.

As made before the trial court, plaintiff's argument for invoking subsection (3) appears to be based upon the language of Rule 703 of the Federal Rules of Evidence, which at least implies that experts will be present in court to hear the evidence:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

This view has support from Judge Weinstein, who observes:

> Certainly an expert who intends to base his opinion on "facts or data in the particular case" (Rule 703) will be unable to testify if he has been excluded [from the courtroom by an order under Rule 615].

3 Weinstein's Evidence, *supra,* ¶ 615[01] at 615–8.

That an expert witness may be assisted by being present in the courtroom to hear the testimony upon which he is expected to base his expert opinion, as set forth in Rule 703, does not in our judgment furnish an automatic basis for exempting him from sequestration under Rule 615. *Cf.* 6 Wigmore, *supra,* § 1841 at 475. The reason for our conclusion is simple: had the framers intended it, they would have said so, or added a fourth exception. It is true that an expert witness does not normally testify to his firsthand knowledge of the facts of the particular case and therefore will not be in a position to conform his testimony to that of others even if so inclined. Nevertheless, the very breadth of the permissible scope of testimony by an expert witness suggests that in some circumstances at least, the trial judge could be justified in holding that his presence in the courtroom was not essential and that his exclusion from the courtroom might in a given case make a more objective and, perhaps, more honest witness out of him.

■ We therefore hold that where a party seeks to except an expert witness from exclusion under Rule 615 on the basis that he needs to hear firsthand the testimony of the witnesses, the decision whether to permit him to remain is within the discretion of the trial judge and should not normally be disturbed on appeal. *See generally* 3 Weinstein's Evidence, *supra,* ¶ 615[01] at 615–8. On the other hand, where a fair showing has been made that the expert witness is in fact required for the management of the case, and this is made clear to the trial court, we believe that the trial court is bound to accept any reasonable, substantiated representation to this effect by counsel.

## II

Plaintiff qualified an expert in "economic projections" for the purpose of establishing the present value of the decedent's projected earnings and from that, the pecuniary loss to the widow and children resulting from Michael Morvant's death. In addition to computing his lost wages between the date of death and the trial of the case at $18,198.86, the expert testified to a gross loss of future income of $565,465.90, measured from the trial date to a projected date of retirement at an age of 62.5 years. By totalling the projected earnings and discounting them at a rate of 5% per annum and adding to that the amount of lost wages between the date of death and trial, the expert arrived at a sum of $287,508.71. From this he deducted 20% representing the amount he concluded the decedent would have spent on himself. He, therefore, assumed that the remainder would be available for the support of the decedent's wife and family over the period of his work life. All of this testimony was admitted into evidence without objection by the defense, which was left free to test the accuracy of the expert's assumptions and projections by cross-examination and by any counter evidence which it might desire to introduce. On cross-examination, the defense brought out the fact that the expert's income projections were based on the questionable as-

sumption that the deceased would have continued to work seven days a week for his entire work life as he had been doing at the time of his death. It also properly brought out the possibility of illness, anticipated absences for other reasons, the vagaries of the business in which Morvant was engaged, and the differences in life expectancy according to different available life expectancy tables. On cross-examination, the defense also brought out many other circumstances which might occur to a wage earner to decrease his earnings, such as mental illness, being the victim of crime, and general recessions. It also cross-examined the expert on the 5% discount rate employed, pointing to higher yields which might be obtained from sound investments. With respect to the deduction of 20% for personal maintenance, the defense brought out the fact that Morvant's contribution would vary over the years and that he might be expected to devote more to his own needs and desires when the children were out of school and independent. In sum it can fairly be said that the plaintiff's careful direct examination of the expert witness and the equally careful cross-examination by the defense presented the jury with a fair and comprehensive appraisal of the projected income and expenses of the deceased. From this evidence the jury could have determined with reasonable certainty the economic contribution of Morvant to his family, to the extent that the evaluation was based upon Morvant's rate of income at death.

▪ The foregoing testimony, however, did not include any factor either for inflation or for any increase in earning capacity which might have occurred due to Morvant's developing skill and experience.[3] The effort of the plaintiff's expert to testify to future wage increases was met by the sustained objection of the defense to such testimony on the basis of *Petition of United*

*States Steel Corp.*, 436 F.2d 1256 (6th Cir. 1970), *cert. denied,* 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153 (1971). We conclude that the trial judge's rejection of this testimony arose from an erroneous interpretation of *United States Steel,* especially as the concepts therein announced were further refined in *Bach v. Penn Central Transportation Co.,* 502 F.2d 1117 (6th Cir. 1974).

In *United States Steel,* our circuit held that it was error in determining the loss of a decedent's earning capacity to have added to the established earnings of the decedent prior to his death an annual increase of 4% to 5% representing increased productivity and inflation, where it was shown that the decedent's employment was subject to a collective bargaining agreement which restricted annual wage increases to 1½% per annum. 436 F.2d at 1275. Specifically our court held that the more generalized projections of actuaries and economists must yield where the uncontradicted facts of the particular case establish that the decedent's earnings would increase at a lesser rate. This is, of course, quite different from ruling, as the trial court did here, that no increases were to be allowed in any event.[4]

In *Bach, supra,* our court made clear that it was altogether appropriate for the jury to consider future increases or decreases in the purchasing power of money in making an award based upon the projected future earnings of the decedent. At the same time it upheld the trial court's exclusion of testimony by an economist projecting lost future wages. Starting with a base figure of $13,496 representing the decedent's income for the last full calendar year prior to death and adding amounts representing inflation and future increases in income, the economist in *Bach* was prepared to testify that the decedent would have had an income of $49,413.12 in the year 2002. As the court observed:

---

3. The projection for future lost wages did, however, account for a pay raise which had been given by the company between the date of Morvant's death and the trial.

4. Presumably upon remand in *United States Steel,* the Commissioners were empowered to make proper adjustments to allow for the 1½%

increase reflected in the record. The court took particular care to find no additional error in the Commissioners' computation of the decedents' earning capacity loss, other than holding that the most recent year of earnings before a decedent's death was the appropriate base for computations. 436 F.2d at 1275.

In recent history inflation has been so persistent that it is difficult to conceive that the purchasing power of the dollar might remain constant through the year 2000. On the other hand, the predictive abilities of economists have not advanced so far that they can forecast with any certainty the existence and rate of inflation for the next thirty years. Limited use of economists and other experts may be appropriate in some cases to show that raises in income or promotions would most probably occur. *See Senn v. Lackner,* 91 Ohio App. 83, 100 N.E.2d 432 (1951), aff'd 157 Ohio St. 206, 105 N.E.2d 49 (1952). Yet testimony on the exact income that the decedent would have received through the year 2002 is so speculative, in our view, that it is inadmissible.

We do not hold, however, that the jury may never consider inflation and future increases in income in determining damages. Ideally, the damage award should compensate appellant for the financial loss she will suffer as a result of the death of her husband. If a jury is not permitted to consider decreases in the purchasing power of money, appellant would be woefully damaged if inflation should continue at its present or at any other substantial rate. Some consideration of probabilities is inevitable in any fair award of damages. The court's role is to keep such extrapolations within reasonable bounds and insure that they conform to the evidence. *Har-Pen Truck Lines, Inc. v. Mills,* 378 F.2d 705, 709–710 (5th Cir. 1967).

Even though no expert testimony on inflation and future increases was admitted, it was still error for the district court to charge the jury that it should not consider "future increases or decreases in the purchasing power of money." *Cf. Willmore v. Hertz Corporation,* 437 F.2d 357 (6th Cir. 1971). Inflation is a fact of life within the common experience of all jurors. Admittedly, if the jury considers this issue without expert testimony, their calculations will be even more imprecise. There is always a chance that the verdict may be too generous. But if jurors should be prohibited from applying their common knowledge of inflation in reaching a verdict, the party entitled to recovery could be grievously under-compensated. The court can always rectify an exorbitant verdict through its power of remittitur. See 6A Moore's Federal Practice ¶ 59.05[3].

502 F.2d at 1122.

In fairness to the trial judge, we recognize that he may have concluded that the plaintiff's economist was endeavoring to present to the jury the type of future projection which was rejected in *Bach* as being too speculative.[5] At the same time it is clear that *Bach* does not bar all such expert testimony and holds that, in fact, it is error to preclude a jury from considering factors affecting future wages, such as inflation and, we conceive, evidence of an individual's propensity to increase in productivity and hence earning capacity. The inflation observed in 1974 in *Bach* is no less evident in 1977 and 1978. And in this case, because of the decedent's youth, other factors are particularly important. In sum, the stability of Morvant's home life and background, the diligence with which he attended to his work, his expanding experience in the trade, and the demonstrated improvement in his financial circumstances from year to year, as well as inflation, point to the conclusion that Morvant's income would have grown over his working life. The trial judge's ruling deprived the jury of evidence necessary to reach such a conclusion. While no objection was made to the instructions as given, we note that they did not permit the jury to infer increased earn-

---

**5.** Plaintiff sought to overcome any possible objection by representing to the court that the economist would not specifically project Morvant's income, but the income of "someone of the same class or status as the deceased." We do not conceive that this would automatically have satisfied the proscriptions of *Bach* if the result, hypothetical or otherwise, would still be too speculative. What *Bach* aimed at preventing was a projection of statistical data so attenuated as to be *reductio ad absurdum,* thus allowing damages to be ballooned beyond all rational experience.

ing capacity based upon the evidence before it. The fact that the ruling of the court excluding the evidence appears to have been made in the presence of the jury further compounds the potential injury and compels reversal here.

### III

Also on the strength of its interpretation of *United States Steel,* the trial court excluded plaintiff's effort to present expert testimony concerning the economic value which the decedent contributed to the family, apart from his wages, by virtue of services performed around the home. The district court's rejection of additional economic testimony concerning the value of decedent's household services again represents an erroneous interpretation of that case. Once more, at least a substantial part of the fault for the court's error in this regard must lie at the doorstep of the plaintiff's counsel, who appears to have misconceived *United States Steel,* thus allowing little opportunity for correction.[6] Hauling out the garbage, mowing the lawn, making repairs, and other household tasks may be performed by a father as labors of love, but they are labors nonetheless, and historically where they have been performed for others, they have commanded an economic price which we think may fairly be included as a part of the pecuniary loss suffered by the decedent's family,[7] considered apart from the non-pecuniary element of loss of society.[8]

6. The record indicates that plaintiff's counsel acceded to the court's interpretation of *United States Steel* but argued, incorrectly, that the case had been legislatively overruled by Federal Rules of Evidence 702 and 703.

7. E. g., *United States Steel, supra,* 436 F.2d at 1277; 2 Benedict on Admiralty § 86 at 7–46 & n. 6 (7th ed. 1975). In a wrongful death action under either the Jones Act or the general maritime law, the loss of services is a recognized element of damages.

8. The trial judge instructed the jury that if they found that Morvant's death was caused by the unseaworthiness of the *Marco,* they could add to the award for pecuniary loss an additional sum representing reasonable compensation for the loss of decedent's society to his wife and children, which would include love, companion-

Expert testimony concerning the pecuniary value of such services has been common where the decedent was the wife and the plaintiff was her surviving husband. *See Har-Pen Truck Lines, Inc. v. Mills,* 378 F.2d 705 (5th Cir. 1967), cited with approval in *Bach, supra,* 502 F.2d at 1122. *Har-Pen* expressly upheld the testimony of an expert concerning the value of a hypothetical housewife. *See* 378 F.2d at 711–12. *Accord, e. g., Haddigan v. Harkins,* 441 F.2d 844, 851–52 (3d Cir. 1970). While we are impeded here, as we were in consideration of the projection of future earnings, by the fact that no separate record was made, we nonetheless conclude that it was error for the trial court so summarily to have cut off the proffered testimony of the economist, whose qualifications to testify as an expert had been established. We hold this ruling to be reversible error because its effect was to cut off all further consideration of that element of damages representing the loss of Morvant's household services, an element which we believe should be presented to the jury for its consideration where there is proof to support it. At the same time we recognize the trial judge's discretion to confine the testimony of the expert within the limits of the facts shown concerning the decedent.[9]

Rule 702 of the Federal Rules of Evidence provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact

ship, care, attention, guidance, protection, and comfort, but not including the grief caused by Morvant's death. This was correct under the expanded liability arising after *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), and *Sea-Land Services, Inc. v. Gaudet,* 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974). Societal losses are not, however, an element of damages under the Jones Act. *E. g., United States Steel, supra,* 436 F.2d at 1277. *See generally* 2 Benedict on Admiralty, *supra,* § 86 at 7–49 to 7–50.

9. At the time of the ruling in this case, however, there had been considerable testimony by the widow concerning the household services performed by the decedent.

to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The Advisory Committee Notes to Rule 702 offer further guidance:

Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier. "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Ladd, Expert Testimony, 5 Vand.L.Rev. 414, 418 (1952). When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time. 7 Wigmore § 1918.[10]

■ Whether expert testimony will assist the trier is a question for the trial court:

Whether the two conditions to the admissibility of expert testimony set forth in Rule 702 (a qualified witness who can assist the trier. of fact) have been satisfied, involves a preliminary question for the trial court; and is a determination largely committed to that court. Appellate courts permit trial courts "the widest possible discretion" in making these determinations, and will not reverse a trial

court unless its decision was "clearly erroneous" or "manifestly erroneous."

Naturally this wide lattitude (sic) applies to the trial court's decisions about both the witnesses's (sic) qualifications and his ability to assist the trier of fact. In applying this deferential policy, appellate courts have even upheld the determination of a trial judge, while admitting that if sitting as a trial court they would have reached the opposite conclusion on admissibility. (footnotes omitted)

11 Moore's Federal Practice § 702.10[3] (1976).

■ While we are loath to disturb the trial court's ruling in view of the foregoing standard of review, we nevertheless conclude that reversal is called for here not because the trial court abused its discretion, but rather because it incorrectly conceived that it had no discretion, thus depriving itself, the plaintiff, and the jury of a proper exercise of that discretion, as contemplated by Rule 702.[11]

Upon remand, it will be proper for the plaintiff to present proofs concerning the economic value of the physical labors which the decedent contributed to the household and which were lost to the survivors because of his death. The extent to which the widow's testimony alone will suffice, or the extent to which further testimony by an expert will aid the trier to make a reasonable evaluation of those services, is an issue which we do not address. Upon retrial, it is left to the trial court's discretion, to be exercised free from any misconceived constraint imposed by *United States Steel.*

10. Rule 702, in conditioning the expert testimony on the requirement that it assist the trier, continues the view of our circuit as it existed prior to the adoption of the Rules. *E. g., Bridger v. Union Railway Co.,* 355 F.2d 382, 387 (6th Cir. 1966); *see generally* 11 Moore's Federal Practice § 702.02 at VII–21 to –22 (1976).

11. The Fifth Circuit notes that where a trial court's finding is "tainted by a misapprehension of the controlling legal principles," the appellate court may exercise review "free of the constraints of the clearly erroneous rule." *Higginbotham v. Mobil Oil Corp.,* 545 F.2d 422, 433 (5th Cir. 1977), *petition for cert. granted on another issue,* —— U.S. ——, 98 S.Ct. 54, 54 L.Ed.2d 72 (1977). *See also Ritter v. Morton,*

513 F.2d 942, 949 (9th Cir.), *cert. denied,* 423 U.S. 947, 96 S.Ct. 362, 46 L.Ed.2d 281 (1975); *Case v. Morrisette,* 155 U.S.App.D.C. 31, 475 F.2d 1300, 1307 (1973); *S. S. Silberblatt, Inc. v. Seaboard Sur. Co.,* 417 F.2d 1043, 1055 (8th Cir. 1969); *Darter v. Greenville Community Hotel Corp.,* 301 F.2d 70, 72 (4th Cir. 1962). While *Higginbotham* addresses the standard of review governing findings where the trial court is sitting as the trier of fact, Fed.R.Civ.Pro. 52(a), we conceive that the same principle applies where the trial court has resolved a preliminary question of fact concerning the admissibility of expert testimony based upon a misconception of the law. *See generally* Fed.R. Evid. 104(a).

## IV

The final three assignments of error on appeal are without merit.

■ The trial court did not err in refusing admission of the blueprints of the *Marco,* based upon the inadequate foundation laid for their admissibility at trial.

■ It was not error for the trial court to permit the defense to use leading questions when cross-examining its own employees, who had been called by plaintiff on direct examination as part of her case-in-chief. While Federal Rule of Evidence 611(c) permits the use of leading questions when a party calls a witness identified with an adverse party, there is no complementary provision requiring such a witness to be cross-examined without the use of leading questions by the party to whom that witness is friendly. This matter is within the court's traditional discretion to control the mode of interrogation.[12] We find no abuse in this case.

■ Likewise, we find no error in the amount of the award as representing an undue or unfair allocation of fault for the accident to the contributory negligence of the deceased. We find no persuasive corroboration for the plaintiff's conclusion that the jury reduced its award by 90% to adjust for his contributory negligence.

We note in the first instance that the case was submitted to the jury for a determination on a general verdict and that, therefore, there was no separate determination of this specific element made by the jury. Nor do we see the relationship between the amount actually awarded and the gross amount of decedent's wages as indicating any particular percentage of fault. In any event, it is apparent that even such

a high percentage of contributory negligence was well within the proofs before the jury. Unfortunately for the plaintiff, the evidence of her husband's contributory negligence was particularly strong in this case.

### CONCLUSION

We have reached the decision to reverse with some reluctance, for in most respects the case was fully and fairly tried in the district court and the errors were those which might have been cured by a more thorough understanding by plaintiff's counsel of the existing law, particularly *United States Steel* and *Bach.* Had the errors not posed such a potential injury to the substance of the claim of the widow and the children of the deceased, we might have been disposed to affirm. An overall consideration of the ends of justice, however, persuades us to remand for a new trial.

Reversed and remanded for a new trial.

---

**12.** Rule 611(c) provides in part: "Ordinarily leading questions should be permitted on cross-examination." As the Advisory Committee Notes explain:

> [Rule 611(c)] conforms to tradition in making the use of leading questions on cross-examination a matter of right. The purpose of the qualification "ordinarily" is to furnish a basis for denying the use of leading questions when the cross-examination is cross-examination in form only and not in fact, as for example the "cross-examination" of a party

by his own counsel after being called by the opponent (savoring more of re-direct) or of an insured defendant who proves to be friendly to the plaintiff.

The right of a cross-examiner to employ leading questions is not absolute under Rule 611(c). If the witness is friendly to the examiner, there is the same danger of suggestiveness as on direct; and consequently the court may, in its discretion, forbid the use of leading questions. 3 Weinstein's Evidence, *supra,* ¶ 611[05] at 611–59.