ESTATE OF Margaret ZARIF, aka Margaret Jones, by Michael D. JONES, Personal Representative, Plaintiff,

v.

KOREAN AIRLINES CO., LTD., Defendant.

No. 83–CV–73777–DT.

United States District Court, E.D. Michigan, S.D.

Oct. 7, 1993.

Gerald E. Thurswell, Southfield, MI, for plaintiff.

Robert R. Florka, Bloomfield Hills, MI, George N. Tompkins, Jr., New York City, for defendant.

### MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

Margaret Zarif was one of the 269 persons who lost their lives when Korean Air Lines Flight KE 007 crashed into the Sea of Japan after a Soviet missile attack on September 1, 1983. This lawsuit, filed by her son as personal representative of her estate and on his own behalf, was one of six filed in this district by the families of the six Michigan passengers who were aboard. These cases, with all others filed nationwide, were transferred by the Panel on Multidistrict Litigation to the United States District Court for the District of Columbia for a consolidated trial on the question of liability. *In Re Korean Air Lines Disaster of September 1, 1983,* MDL Docket No. 565, Nos. 83–2793, *et al.* After resolution of a number of questions concerning liability and applicable procedure, the cases were returned to their original districts for trial on the question of compen-

satory damages. In this Court, jury trials have been held on four of the six cases filed, one was settled, and this case was tried to the bench when Plaintiff waived his jury demand, which had been disputed by Defendant in all of these cases, *ab initio*. Accordingly, this memorandum constitutes the Court's findings of fact and conclusions of law on the question of the compensatory damages to be awarded to Ms. Zarif's estate for her pre-death pain, suffering, anguish, and terror; and to her son, Michael Jones, on his claims for the loss of his mother's society, love, affection, guidance, companionship, nurture, training, education, services, and economic support.

Ms. Zarif and her husband had adopted their son, Michael, in Virginia in 1958, one month after his first birthday. The scrapbook which she kept through his early years attests to her great devotion to this child, and their relationship remained close until her death. She had divorced her former husband in 1966 and he died in 1975. After Michael Jones graduated from high school at 18, he remained in his mother's home until age 23, when his work transferred him to Saginaw. Thereafter, although he had his own apartment in Saginaw, he returned each weekend until her death to his mother's home in Detroit; and spent those weekends not out on the town, but enjoying her company, conversation and counselling. After high school, Mr. Jones attended Detroit Institute of Technology, earned a certificate from Control Data Institute, and began full-time work with a division of the Burroughs Corporation which became Fujitsu. He lived expense-free with his mother until the Saginaw transfer in 1981, and continued there with Fujitsu until July of 1988, when he moved to Washington, D.C. because, he testified, the sadness of remaining in his late mother's community became unbearable.

Mr. Jones testified to the extreme sense of loss he has felt since he was notified, by a mutual friend, that his mother's plane had crashed over the Sea of Japan on September 1, 1983. Because they had no other family, and because of their closeness, he has felt alone in the world since that date, and has been unable to form another close relationship. He spoke of their travels together, playing the piano together, and of his need for her guidance and counsel, as a "person who would accept me, especially, as I am."

Mr. Jones also testified that he underwent physical changes after his mother's death and has not slept well, ever since. He said that he saw a psychiatrist in 1984 who told him that he may never get over his grief. No medical evidence was offered on that subject, however.

\*　　\*　　\*　　\*　　\*　　\*

Ms. Zarif had been assigned seat 27A on the Boeing 747 which departed Kennedy Airport August 31, 1983, designated KE 007 and bound for Seoul, Korea. The facts and circumstances surrounding the termination of that flight have been in dispute for the ten years since, and the final and most authoritative investigative report in the matter was not promulgated until after plaintiff had rested his case, in this last trial. The four cases which this Court tried to juries presented the question of what exactly happened to these passengers through the same major pieces of evidence. They were a "Final Report of Investigation" of the International Civil Aviation Organization (hereafter ICAO) made pursuant to resolution of the United Nations Security Council on September 16, 1983, "to determine the facts and technical aspects relating to the flight and destruction of Korean Air Lines (KAL) 007"; a United States Department of State telegram; and an exhibit called "The Russian Translation" by counsel, which consisted of partial records of the shoot-down in Russian, accompanied by English translations thereof, which were handed by Russian President Boris Yeltsin to U.S. Secretary of State James Baker in the fall of 1992, as a gesture of friendship. With those basic exhibits, prior Plaintiffs and Defendant each presented experts in accident reconstruction and investigation, and aviation physiology, to opine as to what had befallen these passengers.

In this trial, Plaintiff's experts testified by videotapes of their testimony at the first of these cases, and the exhibits noted above, *inter alia*, were received. After Plaintiff had rested, however, it was discovered that, on June 15, 1993, ICAO had promulgated a *sec-*

*ond* "Report of the *Completion* of the Fact–Finding Investigation Regarding the Shooting Down of Korean Air Lines Boeing 747 (Flight KE 007) on 31 August 1983". (Emphasis added). The Introduction notes that:

The [Security] Council, at the fifteenth meeting of its 137th Session on 18 December 1992, considered C–wp/9684 and C–wp/9685 on the subject of the shooting down .... and decided (C 137/15) to complete the fact-finding investigation which ICAO initiated in 1983. The Council instructed the Secretary General to request all parties involved to cooperate fully with the Organization in turning over to ICAO, as soon as possible, all relevant materials, including the original tapes of the cockpit voice recorder (CVR) and digital flight data recorder (DFDR). The Council further instructed the Secretary General to undertake the investigation on an urgent basis and report back to the Council as soon as possible.

Thereafter, the Government of the Russian Federation handed over to ICAO the CVR and DFDR tapes from KE 007, which its divers had found in the Sea of Japan 10 years ago, and all of its documentation, including radio transcripts; ICAO worked in cooperation with four Observer States, the United States National Transport Safety Board ("NTSB"), our national panel *for domestic air accident investigations*, the Department of State, the Department of Defense, and the Federal Aviation Administration ("FAA"). The team worked in Korea, the United States, Japan, and in the Russian Federation, even meeting with three of the divers who had retrieved the recorders. They did simulations of movements recorded on the DFDR at Boeing, and more in Korea. The Report, in short, is comprehensive; and it has been done by the world's recognized authority in international aircraft accident investigation.

As stated above, the Court was advised of the new Report after Plaintiff had rested his case. At the request of Defendant, the trial was adjourned for its experts to study the Report, and in the defense case the expert testimony was, in essence, a critique and denunciation of the Report, which lends great support to the opinions of Plaintiff's experts, given without its benefit, that the passengers on KE 007 were subjected to a substantial period of conscious pain, suffering, fear and anguish before they were killed by the collision of the plane with the sea. The defense experts, despite the factual data of the Report, are of the opinion that the passengers were rendered instantly unconscious by the decompression caused when the missile struck the plane and were killed when the plane disintegrated in mid-air. Therefore, the defense argues, no passenger suffered even a moment of conscious pain, suffering, or fear. The Court cannot agree with that position.

Captain James McIntyre was Plaintiff's expert in accident investigation. His testimony had been videotaped when he testified live in this courtroom in the first of these five trials, *Bowden v. KAL*, No. 84–75924–DT (E.D.Mich. May 4, 1993), on February 11, 1993; and his opinions as to the events surrounding the termination of this flight were corroborated and supported in every respect by the final ICAO report, published after his testimony with benefit of many previously unknown facts. Captain McIntyre, a retired pilot certified to many models of aircraft including the Boeing 747, has served as the Airline Pilot's Association representative on a number of accident investigation teams for the NTSB; has done human factors consulting for the NTSB, *inter alia*, concerning pilot behaviors; represented the Northwest Airlines pilots on the Northwest # 255 air crash investigation by NTSB in Detroit, and numerous other major air catastrophes, many including rapid decompressions.

Captain McIntyre was of the opinion, after examination of records available in February, that KE 007 had been struck from behind while cruising at 35,000 feet, by one or two of the missiles usually carried by Soviet interceptors (probably the SU–15 he said), at that time. The SU–15 usually carried "at least one infrared missile and one radar-guided proximity-fuse missile," he said. The former would lock onto a source of infra-red heat such as engine exhaust, and the latter would strike the tail section of the Boeing from which radar signals emanated. The Captain

then explained the manner in which the four hydraulic systems of the Boeing 747, controlling the elevators, horizontal stabilizer, rudder, spoilers, and ailerons, are all controlled by cables from the cockpit to the rear, which come together under the vertical fin of the tail section. He explained further the pressurization of the plane and the oxygen systems provided for crew (by positive flow, to force feed) and for passengers (by demand flow, or as inhaled) in case of decompression, or puncture of the cabin pressure chamber at a higher altitude than the 14,000 foot level at which human life may be sustained. He explained that, on the 747, the passenger masks will drop automatically when pressure reaches the 14,000 foot level in the cabin, an alarm will sound, and automatic recorded announcements will instruct the passengers to don their masks. He recalled several accidents in which rapid decompressions had occurred, and the crew had brought the plane home safely.

Captain McIntyre also enumerated the checklist of duties to be undertaken by a Boeing 747 pilot, immediately upon becoming aware of a high-altitude decompression. He said that, upon becoming aware of a perforation, the pilot and entire cockpit crew must first don their oxygen masks. Although those of the passengers will drop automatically if cabin pressure rises above 14,000 foot altitude, the pilot has a switch to drop them, as well. Then, the pilot is to turn on his interphone (as the crew will be speaking into masks) and request recitation of the checklist by the first officer. He must first evaluate the need to and request permission to make a rapid descent, usually to the 10,000 foot level. He must reduce the aircraft's speed in accordance with the manufacturer's certified maximum speed for every degree of downward pitch; so the speed brake is activated and throttles closed. A slight roll is necessary on downward pitch, as well, to maintain a constant gravity force. Pilots are trained and tested in giant plane-like simulators, on all of these procedures. The Boeing 747 is, incidentally, an aircraft so large that the cockpit is two stories above the ground.

Based upon materials reviewed and his knowledge of the requisite crew procedures,

as well as his investigation of numerous other accidents involving puncture of the plane's pressure vessel, Captain McIntyre gave his opinion of what had happened to KE 007. He said that at least one of the SU–15 interceptor's missiles had struck the plane, in the tail, puncturing the pressurized hull and disabling at least some of the hydraulic systems in the tail. A rapid decompression had occurred and the pilot had, as Tokyo radio had reported, stated his intention to drop to 10,000 feet. The pilot then attempted to descend to 10,000 feet with very limited control of the plane, as there is no mechanical backup to the 747's hydraulics controlling pitch and yaw. Without hydraulics, McIntyre said that control can only be maintained by the very "primitive" and "dicey" maneuver of increasing power to an engine on one side, then the other, to attempt to move, or track, forward. The airflow thus created over the swept wings, however, will cause progressively-larger lifts of each wing, which eventually will cause a "Dutch roll", turning the plane over and into a spiral. His opinion was, therefore, that the pilot initially maintained a degree of control after the strike, but that during the descent control was degraded to the degree that the crew could not prevent a crash into the sea. It was his opinion that the plane flew for approximately twelve minutes after the strike and was destroyed upon hitting the sea. It was also Captain McIntyre's opinion that the CVR and DFDR had ceased operation long before the plane was actually down, because of their location at the rear of the pressure bulkhead, served by electric wires from the front, and because this was the area damaged by any tail strike by a radar-guided missile. The electric power disruption was also the reason that Tokyo never heard from the plane after the last call, reporting an attempted descent to 10,000 at 18:27 hours.

The June 15th ICAO Report indicates that the actual facts of the event were, unfortunately, remarkably consistent with Captain McIntyre's earlier opinion. It appears that, beginning at about 16:41 hours, USSR military aircraft had attempted unsuccessfully to intercept KE 007 over the Kamchatka Peninsula. Finally, as KE 007 approached Sakhalin Island at 35,000 feet the SU–15 pilot

behind it launched a heat-seeking missile and a radar-guided missile two seconds later, on orders to destroy the target. When asked by his commander, at 18:53, ".... was it not destroyed?" the Russian radio transcript records his response that:

> The target disappeared, but it was somehow descending slowly ... either it was put out of action or it was damaged. It disappeared in the area of Moneron, no one can see it at the moment.

The KE 007 DFDR indicates that, at 18:26:02 the aircraft was hit by at least one of the two missiles. Although the SU–15 pilot had reported that his first missile hit near the tail and the second "took off half the left wing", he was incorrect about the wing because the aerial at the tip of that wing was subsequently used for the pilot's last radio call. At 18:27:10 that last call to Tokyo was made, reporting "rapid compression" and descent to 10,000. The recorders indicate that within 11 seconds of the hit the cabin pressure was above 10,000 feet, the report states, because the alarm had sounded, and the calling pilot had been speaking through an oxygen mask. Within one minute and 44 seconds of the hit all power was lost to the DFDR and CVR. Immediate controllability problems had already been recorded, however, and it appeared that one hydraulic rudder control cable had been severed by the hit and quickly unravelled. The plane had immediately pitched up, according to the DFDR, and accelerated vertically at 1.2 forces of gravity, climbing at 7,000 feet per minute for 17 seconds and continuing to climb, but more slowly, for 23 more seconds, rolling to the left with large erratic wheel control movements, to a maximum height of 38,250 feet and slowing from a speed of 286 knots to 220. Speed brakes were attempted to be applied.

Then began the descent, at speeds of up to 12,000 feet per minute and 284 knots, briefly, and vertical (downward) acceleration of over twice the force of gravity. It rolled left, 52 degrees. Then the pilot recovered level flight, but rolled right 49 degrees at 33,850 feet; at which point (104 seconds after hit) both the CVR and DFDR ceased operation, simultaneously. The report notes that they were located above the rear passenger doors

with power supply cables meeting at the rear.

Soviet radar last sighted KE 007 at 18:35, nine minutes after the hit, at 5,000 metres (roughly 15,000 feet) where it had exited Soviet airspace and was re-entering in the area of Moneron Island. Radar contact was lost at 18:37 and a full cloud cover at 2,000 metres made further search impracticable, for the Soviets. Attached hereto as Exhibit A is the page of the ICAO report from Russian Radar records indicating the tracks of KE 007 and the interceptor SU 15, to convey a visual understanding of the number of whorls and rolls which the plane took in descent, over many miles, before the crash into the Sea of Japan, between tiny Moneron Island and the larger Sakhalin.

The ICAO Report notes that the initial high-speed climb to 38,250 indicated that all four engines were functioning normally, and the infra-red missile had not honed directly onto an engine. However, within a second or two, a rudder cable had failed, as had a crossover cable between elevators; hydraulic systems 1, 2, and 3, had failed; structural damage had reduced aerodynamic effectiveness; and from the known volume of the pressure cabin and time before the alarm sounded, it was deduced that holes in the total approximate size of 1.75 square feet had punctured the vessel. The failure of the hydraulic systems was reported as accounting for the "roll attitudes from the start of the attack phase at a frequency close to that of the dutch roll." Later tests on Boeing simulators had demonstrated that control was reduced because only hydraulic system # 4 remained. That condition accounted for most of the aircraft's lack of response in roll. Remaining control had been reduced to only the right inboard aileron and the innermost of the five spoiler segments on each wing. The Report finds that the crew responded correctly to the circumstances presented.

There was one eyewitness to the destruction of KE 007, a Japanese fisherman who was interviewed by the Japanese Maritime Safety Agency. The Report indicated that:

> [H]e was on the bow deck when he heard the sound of an aircraft which gradually grew louder. He concluded from the

sound that the aircraft was at a low altitude but did not see it. Then he heard a loud sound followed by a bright flash of light on the horizon, then another dull sound and a less intense flash of light. He estimated that the flashes of light that he saw took place in a southeasterly direction from him somewhere south of the beacon light of Mys Lopatina on Sakhalin Island. Ten to fifteen minutes later he experienced a strong smell of oil which gradually faded away.

During the day he observed several Soviet vessels, an aircraft at low altitude and a patrol boat of the Japanese Maritime Safety Agency in the same general area.

The main wreckage was found by Russian divers on the floor of the sea, due north of Moneron Island, in an area approximately 60 × 160 metres broad and 174 metres deep. It was severely fragmented and no large pieces of the aircraft were left intact. No inventory was made. The largest piece was a four-metre long part of the fin, and pieces of the fuselage skin about 1 metre square helped identify KE 007. Divers saw one or two engines, a few wheels, personal effects including clothing, documents, and wallets, as well as "evidence of human remains", but no bodies. The DFDR and CVR were found, loose on the sea bottom and not attached to any aircraft structure. Their containers appeared to have been deformed by a large distributed force, such as a high-speed water impact.

The Report concludes that the plane had flown for at least 9 minutes in a descending spiral, was lost from radar contact at 5,000 metres at 18:35 hours, and was destroyed upon impact with the sea. "The impact was not survivable," the Report states.

The degree to which this factual Report confirms the McIntyre opinion testimony is extraordinary, and this Court finds both to be completely credible. The plane continued to fly for at least nine minutes, after which it was lost to radar, with all engines and the oxygen system functioning while the crew struggled to regain a continually degrading control. It is apparent that the plane did not disintegrate before colliding with the sea, moreover, because the wreckage was found in such a small area, including tail fin, some engines, and personal effects from within the passenger cabin. Moreover, the eyewitness heard the motors, and saw the final explosion.

The defense accident reconstruction expert, Mr. Rudolf Kapustin, who has served as NTSB Aviation Accident Investigator–In–Charge and Hearing Officer, *inter alia*, during his 47–year career in flight safety, disagrees completely with both Captain McIntyre and the ICAO Report, which trial was adjourned for him to examine. It is his opinion that the Report cannot be believed unless the wreckage is removed from the sea and the plane reconstructed, so that the initial missile damage can be ascertained. Without benefit of such a reconstruction, however, his firm opinion is that the plane went out of control instantaneously after the strike, pitched up to 38,250 feet, stalled, and fell free from the sky. One minute later, when the recorders ceased, he feels that the tail had separated from the plane (although the fin was later found with the main wreckage in a 60 × 160 metre location), and that the wings separated and floated down slowly, while the fuselage disintegrated in the air and plummeted into the sea. The floating wings, he opined, would account for the radar tracks which the Russians and ICAO thought were made by the flying plane. He does not explain the sound of engines (on wings) heard by the eyewitness, to the last; nor the fact that engines were found in the wreckage at the end of the radar trail. Even if all other evidence contrary to Mr. Kapustin's opinion were to be disbelieved, the Court cannot credit the conclusion that the plane disintegrated in the air, yet was found in large part, severely fractured, in such a small area. That fact is extremely strong evidence in support of the ICAO conclusion that the plane was destroyed on impact with the sea. Mr. Kapustin, moreover, has been engaged in testimony for the Air Line about this accident in many courts and cases, for the past year. In each case he has insisted upon the disintegration of the plane in mid-air on far thinner evidence than would support other conclusions, and found all other hypotheses unsupported by sufficient evidence.

Now, in the face of a comprehensive investigation report, he remains unable to utilize more than his own bald speculation.

Mr. Kapustin did, however, concede that the cabin pressure alarm would sound and oxygen be made available when cabin pressure reaches 14,000 feet altitude. Dr. Stanley Mohler, the defense aviation physiology expert, stated that the cabin pressure alarm will not sound until cabin altitude is well above 30,000 feet, because those alarms are built with "a lag in them." That testimony, contradictory to his own testimony on other occasions and to all other evidence in the case on the subject, and suggestive (as much of his testimony was) that the entire airline industry is willfully and deliberately indifferent to passenger safety, casts a serious cloud upon all that Dr. Mohler said.

The question of pressurization and oxygenation becomes important when, in an accident such as this, the cabin pressure vessel is indisputably punctured, and it must be determined whether the passengers passed into early unconsciousness and death, or suffered for a longer, more fearful and more painful period. The factual ICAO report states that, within 11 seconds of the missile striking holes of a total area of 1.75 feet in the hull, the alarm sounded that cabin pressure had reached an altitude above 10,000 feet. Both Captain McIntyre and Mr. Kapustin had testified that the alarm sounds at 14,000 feet, and the Court so finds, giving the defense the benefit of that doubt. When that alarm sounds, the passenger masks drop; a recorded announcement notifies them in three languages to don them; and as we know, the crew was wearing masks during their last call. We also know that when the alarm sounded, the plane was pitching up towards 38,250 feet (from 7 through 40 seconds after the hit), so that the decompression, and the subsequent descent therefrom, posed serious problems to the humans aboard.

Plaintiff's aviation physiologist expert was Commander Robert Elzey, a retired Navy aircraft safety officer who had performed many studies and taught human response to altitude, pressure, and gaseous environmental changes, through use of hyperbaric chambers. These questions are of obvious significance to military fliers, who must recognize immediately when they have moved into an environment in which the human body requires additional oxygen to perform intelligently, or even to remain conscious. To this end, the U.S. Navy has promulgated, in its Flight Surgeon's Manual, a concept called "Time of Useful Consciousness", which is defined as:

> [T]he period between an individual's sudden deprivation of oxygen at a given altitude and the onset of physical or mental impairment which prohibits his taking rational action. It represents the time during which the individual can recognize his problem and reestablish an oxygen supply, initiate a descent to lower altitude, or take other corrective action. Time of useful consciousness is also referred to as effective performance time.

The Manual includes a chart of time of useful consciousness following rapid decompression, which we know that the pilot advised Tokyo this plane was undergoing. At 38,000 feet the mean useful conscious time of all persons tested was approximately 20 seconds; at 35,000 feet the mean is approximately 35 seconds.

Commander Elzey testified by video recorded in February, as McIntyre did, without benefit of the last ICAO report, which indicated this decompression started during a 37–second climb from 35,000 to 38,250 feet and then a rapid descent therefrom. He assumed, therefore, that the decompression started at 35,000 feet and continued in descent from that height. It was his opinion that the passengers, with 35 seconds of useful conscious time even if the cabin was completely decompressed, had ample opportunity to don the masks which dropped in front of them when the alarm and instructions were broadcast, had done so, and had therefore remained intelligently conscious throughout the event until the plane crashed into the sea. Of course, he explained, when the plane had descended below 14,000 feet the oxygen masks were no longer necessary, at any rate.

Commander Elzey and the Manual described numerous other unpleasant effects of hypoxia and atmospheric pressure changes,

as well. The human body contains cavities filled with gases at the pressures of our normal atmosphere. As we move to higher altitudes and lower external pressures, the gases within the body, meeting less external resistance, press out on the delicate membranes (eardrums, diaphragms, intestines, alveoli of lungs) or bony structures (such as maxillary sinuses), and may cause extreme pain under sudden and severe enough circumstances, even causing ruptures. Moreover, after the pain of decompression, the recompression of rapid descent may be even more painful.

The Flight Surgeon's Manual notes that the rate and time of decompression are controlled by the volume of the pressurized cabin, the size of the opening, and the pressure differential between cabin and external atmosphere. Although this was a large plane, the fact that internal pressure had reached 14,000 feet altitude within 11 seconds suggests that it was truly a rapid event. The Manual also states that the characteristics of rapid decompression include an explosive noise, fogging, falling temperature, and a rush of air to the hole causing flying debris or even the loss of an unrestrained person through the hole. On this plane, it is noteworthy that breakfast, as well as an anticipated landing in three hours, had been announced.

The effects of decompression mentioned in the Manual which the defense emphasizes most are the insidious psychological effects of which pilots are warned, and which may delay recognition of any problem. Those include lassitude, somnolence, diminished visual acuity, loss of touch and pain sense, a "release of basic personality traits and emotions", including "euphoria, elation, moroseness, pugnaciousness, and gross overconfidence." Muscular coordination is lost and finally there is almost complete mental and physical incapacitation, resulting in rapid loss of consciousness, convulsions, failure of respiration and death. In this case, however, it cannot be gainsaid that the passengers became aware that a problem had developed when the missile hit their plane and it started an uncontrollable steep climb.

Dr. Mohler, a defense expert, is a professor of aerospace medicine at Wright State University, and was one of the experts responsible for evaluation and drafting of standards for all oxygen systems now utilized in American civil aircraft. He testified that the oxygen masks provided for passengers of this 747 have been in use for 25 years, that they are so flimsy, "primitive", and entangled when dropped that these passengers never got them on; and were useless at these altitudes, even if they did.

It was Dr. Mohler's opinion that the passengers went from sleep (because the local time was 3:00 a.m.) directly to unconsciousness; or that they were never able to reach their masks, which were kited along the plane ceiling by cyclonic winds, felt euphoria and confusion, belched, passed flatus, became unconscious within 10 seconds, and died. He testified that the Manual charts' times of useful consciousness were applicable to young, fit, men who knew they would be decompressed in advance, and not unwitting passengers. The passengers, moreover, felt no fear or panic; only as though slightly drunk. Also, at either 35,000 or 38,000 feet, he said that it is absolutely impossible to gain any benefit from passenger oxygen, if taken.

On cross examination, Dr. Mohler acknowledged having written an article in 1970 concerning the effects of decompressions at 38,000 or 40,000 feet which may occur by loss of a plane's window, door, or broken engine which perforates the hull. He wrote, then, that passengers had useful consciousness times of 15 seconds at 40,000 feet; 20 seconds at 35,000 feet, and 30 seconds at 30,000 feet. Unaware of the dimensions of a Boeing 747, he could not compare the 1.75 square foot perforations of this case (of which he was unaware) with the loss of doors or windows. The kiting of masks, he insisted, would occur whether the perforation was under the passenger compartment or within it, and would have the same effect for every passenger, including Ms. Zarif in seat 27A. He acknowledged knowing of a Hawaiian Airlines accident in which a door was lost at 35,000 feet, all aboard had donned masks and all had landed safely. He described his slides of a DC10 accident at Albuquerque, New Mexico, in which a window was lost, multiple punctures were made in the fuselage

from an impeller off of the left wing, and the hydraulic system was lost. All aboard put on their masks, the pilot dived at velocities of 15,000 to 20,000 feet per minute, and landed. All were safe except for the passenger who went out the window, he said. He also acknowledged testifying in another KE 007 trial in Washington D.C. that passengers had 15 to 18 seconds of useful time; that a hole large enough to cause cyclonic winds would be "three or four feet in diameter," for example; and of his opinion that this plane was decompressed in two seconds. Also, at an earlier deposition, he testified that, when he was part of the FAA, it was determined that a lay passenger had a minimum of 16 seconds of useful conscious time in an explosive rapid decompression at 35,000 feet. He testified here that he is unaware of the 747 cabin volume, and that it is irrelevant to his opinion, at any rate. Finally, he testified that, when the alarm sounded 11 seconds after the hit, cabin altitude had really reached 30,000 feet and not the 10,000 to 14,000 feet advised by all other authorities, because the alarms "have a lag in them." As, in his opinion, passenger masks are useless above 30,000 feet, they were therefore useless when they dropped.

In short, Dr. Mohler's testimony here appears to have been an attempt to show, at all costs, that Ms. Zarif could not have suffered any pre-death pain or fear whatsoever. It was internally inconsistent, and contradicted by the Manual, the ICAO report, his own previous testimony and writings, as well as by all other expert witnesses, including even Mr. Kapustin. The Court finds his testimony incredible.

It appears to the Court that the passengers, who had already likely been awakened by the breakfast and landing announcement, most certainly heard the missiles strike, heard the explosive sounds of decompression, heard the pressure alarm, and had ample time to don their masks (between 20 and 35 seconds). They were aware of the plane zooming to 38,250 feet, out of control, and of the rapid descent (with limited control and at forces up to twice that of gravity), of the rolls

which culminated in the Dutch roll, and spirals, and of at least the entire nine minutes during which they were tracked down to 15,000 feet on radar. The final spiral and explosion into the sea followed. The fearfulness and pain of the experience need not, and cannot, be described.

\*     \*     \*     \*     \*     \*

The Court has, by earlier opinion, ruled that Plaintiff may recover compensatory damages, pursuant to the Warsaw Convention. *In re Korean Air Lines Disaster of Sept. 1, 1983*, 814 F.Supp. 592, 597–98 (E.D.Mich.1993) (*"Korean"*).[1] After Plaintiff's proofs, the Court ruled that only one claim for economic support would stand, striking a claim for loss of inheritance. The remaining four claims were for Plaintiff's loss of society, loss of services, grief and mental anguish, and for the decedent's pre-death pain and suffering.

For her pre-death fear, pain, and suffering, for which the law is only capable of making a monetary award to her estate, the Court awards the estate of Margaret Zarif the sum of one million dollars ($1,000,000.00).

The claims of Ms. Zarif's son, Michael Jones, are more problematic. His claim for loss of nurture has been defined as "the pecuniary value of what [a] decedent might reasonably have been expected to give his children during their minority." *Thompson v. Camp*, 163 F.2d 396, 403 (6th Cir.1947), *cert. denied*, 333 U.S. 831, 68 S.Ct. 458, 459, 92 L.Ed. 1116 (1948), citing *Norfolk and Western Ry. v. Holbrook*, 235 U.S. 625, 629, 35 S.Ct. 143, 144, 59 L.Ed. 392 (1915). "The opportunity and necessity for [intellectual, moral, and physical] training and guidance diminish in the normal child as he reaches majority and leaves his parents' roof for college or for his own separate home." *Solomon v. Warren*, 540 F.2d 777, 789 (5th Cir. 1976), *cert. dismissed sub nom., Warren v. Serody*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). (Citations omitted). *See also Michigan Central R.R. v. Vreeland*, 227 U.S. 59, 73, 33 S.Ct. 192, 197, 57 L.Ed. 417 (1913) ("the duty of the mother to *minor* children is

---

1. Compensatory damages are damages in satisfaction of, or in recompense for, actual loss or injury sustained. 22 Am.Jur.2d *Damages* § 23 (1988).

that of nurture, and of intellectual, moral, and physical training ...") (emphasis supplied); *De Centeno v. Gulf Fleet Crews, Inc.,* 798 F.2d 138 (5th Cir.1986) (decedent's children were awarded loss of nurture damages until they reached the age of majority).

Loss of nurture damages are extended to adult children only in certain circumstances:

Whatever may be the rule for minor children, it is clear that those who have reached their majority must be very specific to show that their parents' guidance had a pecuniary value beyond the irreplaceable values of companionship and affection.

*First Nat'l Bank in Greenwich v. Nat'l Airlines, Inc.,* 288 F.2d 621, 624 (2d Cir.), *cert. denied sub nom., Kessler v. Nat'l Airlines, Inc.,* 368 U.S. 859, 82 S.Ct. 102, 7 L.Ed.2d 57 (1961), *citing Michigan Central R.R. v. Vreeland,* 227 U.S. at 73, 33 S.Ct. at 197.

The Second Circuit stated that "[w]e consider the allowances for loss of nurture as 'awards for financial loss to dependents.'" *Moore–McCormack Lines, Inc. v. Richardson,* 295 F.2d 583, 598 n. 9A (2d Cir.1961), *cert. denied,* 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526 (1962) (citation omitted). "In the absence of evidence that an adult child is either dependent upon or had any reasonable grounds for expecting any pecuniary benefit from a continuance of the decedent's life, a recovery on behalf of such child is excluded." *Kozar v. Chesapeake and Ohio Ry.,* 449 F.2d 1238, 1243 (6th Cir.1971).

As a self-supporting adult, Mr. Jones' claims for training and nurturing, guidance and education are not and should not be of the value of a dependant minor child's. *See Theama by Bichler v. City of Kenosha,* 117 Wis.2d 508, 516, 344 N.W.2d 513 (1984) ("while an adult is capable of seeking out new relationships in an attempt to fill in the void of his or her loss, a child may be virtually helpless in seeking out a new adult companion"). Ms. Zarif had more than fulfilled her responsibilities to the instant Plaintiff and, it is hoped, had imparted her values and attitudes to him by the time of her death. She, who had made her way alone through the world so generously and successfully, making her happiness in service to others, surely had

prepared her son for that journey by the time he reached the age of 23.

█ Many of the reasons for rejecting the loss of nurture claim also apply to the claim for loss of economic support. "Recovery for loss of support has been universally recognized and includes all the financial contributions that the decedent would have made to his dependents had he lived." *Sea–Land Services v. Gaudet,* 414 U.S. 573, 584–85, 94 S.Ct. 806, 814–15, 39 L.Ed.2d 9 (1974), (interpreting the Death on the High Seas Act, 46 U.S.C. § 761 *et seq.* ("DOHSA"), *rev'd on other grounds sub nom., Miles v. Apex Marine Corp.,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990)).

Although Plaintiff testified that his mother paid for his tuition from 1976–1977, he later testified that in 1978, she merely co-signed his student loan because he "wanted to be independent." No evidence was presented that this independence had dissipated. Plaintiff was gainfully employed and had been living on his own for the two years prior to his mother's death. She did not, as was acknowledged by Plaintiff's attorney, claim him as a dependent on her income tax returns the three years preceding her death. Plaintiff, when deposed, had previously testified that, except as a weekend guest during which he did not pay for rent or groceries, he did not receive financial support from his mother from 1978–1981.

The evidence thus supports the conclusion that Plaintiff was not a child, but an adult son, at the time of Ms. Zarif's death. He failed to present evidence of any dependency upon his mother, or reasonable expectation of any pecuniary benefit from her. She no longer supported him, thus precluding Plaintiff's claim for loss of economic support.

█ Plaintiff further claims to have lost the services provided by the decedent. Damages for loss of services are defined as the "monetary value of services the decedent provided and would have continued to provide but for his wrongful death." *Gaudet,* 414 U.S. at 585, 94 S.Ct. at 815. Such gratuitous services include cooking, cleaning, lawn-

care, and shopping.[2] A plaintiff is required to prove that such services were expected and likely to be provided, but for the wrongful death. *Bergen v. F/V St. Patrick,* 816 F.2d 1345, 1350 (9th Cir.1987), *modified on other grounds sub nom., Bergen v. F/V St. Patrick,* 866 F.2d 318 (9th Cir.), *cert. denied,* 493 U.S. 871, 110 S.Ct. 200, 107 L.Ed.2d 154 (1989) (interpreting DOHSA). Courts consider the following factors in determining damages for loss of services:

(a) The type of services performed by the decedent;

(b) The market value of services performed by the decedent;

(c) The amount of time the decedent spent per week/year to perform the services in light of the decedent's age and nature of the decedent's occupation;

(d) The decedent's work expectancy with respect to the services performed; and

(e) The nature of the relationship between the particular beneficiary and the decedent.

*See Bergen,* 816 F.2d at 1350; *Morvant v. Construction Aggregates Corp.,* 570 F.2d 626, 633 (6th Cir.1978), *cert. dismissed,* 439 U.S. 801, 99 S.Ct. 44, 58 L.Ed.2d 94 (1978) (action under the Jones Act and general maritime law).

■ However, the instant Plaintiff presented no evidence that his mother provided any type of services to him. He testified that he visited her on weekends, but no evidence suggests that any specific services were provided, nor any evidence as to how long Plaintiff expected to continue receiving them. Moreover, no pecuniary value has been placed in evidence as to the decedent's services, or even the value of Plaintiff's weekends absent the expenses of rent, utilities, or groceries. Without evidence of the type of services or the value thereof, any award of damages for loss of services would be based on pure guesswork. *Morvant,* 570 F.2d at 633. Therefore, Plaintiff is not entitled to an award for loss of services.

■ Plaintiff also failed to prove his claim for grief and mental anguish. This Court's prior opinion required each Plaintiff in these companion cases to present evidence that Defendant's actions caused Plaintiffs' personal grief and mental anguish which resulted in physical injury and damage. They may not recover for grief which did *not* result in physical manifestations. *Korean,* 814 F.Supp. at 599, *citing Eastern Airlines, Inc. v. Floyd,* 499 U.S. 530, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991) (concerning mental injury to passengers).

Recoverable damages for grief and mental anguish would include reimbursement for the costs of psychological counseling and/or medical treatment. These readily ascertainable figures include, but are not limited to, loss of time missed from work, hospitalization, as well as medical and counselling expenses. At trial, however, Plaintiff failed to present any evidence of any identifiable injuries or specific, measurable expenses he had incurred due to his mother's death. He testified that he saw a psychologist in March, 1984 because of grief. But Plaintiff offered no medical evidence, or bills, invoices or check stubs as indicia of payment. He further testified that his grief caused hair loss, the thickening of the roots of his hair, the swelling of his face, and that it made his heart race. However, he appears to have never sought medical treatment for these ailments. No award is made for Plaintiff's grief and mental anguish, because of the lack of medical evidence to support the unusual physical effects to which he testified.

■ Lastly, Plaintiff seeks damages for the loss of his mother's society. "The term 'society' embraces a broad range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort, and protection." *Gaudet,* 414 U.S. at 585, 94 S.Ct. at 815. Plaintiff has proved that a close and loving relationship

2. ("Hauling out the garbage, mowing the lawn, making repairs, and other household tasks may be performed by a father as labors of love, but they are labors nonetheless, and historically where they have been performed for others, they have commanded an economic price which we think may fairly be included as a part of the pecuniary loss suffered by the decedent's family....") *Morvant,* 570 F.2d at 633.

existed between himself and the decedent. Indeed, Ms. Zarif's "labors of love" for her son, an independent adult, which precluded an award for loss of economic support, are facts which amply support an award for his loss of her society.

For the loss of the society, companionship, love, and affection of his mother for the past ten years, Mr. Jones is awarded $500,000.00. As there was no evidence of her life expectancy, no award is made for the future.

SO ORDERED.

## JUDGMENT

This matter having come before the Court for trial, and the Court having entered its Memorandum Opinion and Order, constituting its findings of fact and conclusions of law,

Now, therefore,

**IT IS ORDERED AND ADJUDGED** that damages be awarded to the Estate of Margaret Zarif, a/k/a Margaret Jones, by Michael D. Jones as follows:

Compensation for the predeath fear, pain, and suffering that Margaret Zarif suffered prior to her death.... $1,000,000.00;

Compensation for the loss of society, companionship, love, and affection resulting from the death of Margaret Zarif on September 1, 1983 until the present, for her son, Michael D. Jones.... $500,000.00.

**IT IS ORDERED,** that judgment shall enter in favor of Plaintiff, Michael D. Jones, personal representative of the Estate of Margaret Zarif, in the principal amount of One Million Five Hundred Thousand ($1,500,000.00) Dollars.

**IT IS SO ORDERED.**

## EXHIBIT A

Chart 14. USSR Plotted Tracks in the Sakhalin Area
Graphique 14. Trajectoires dans la région de Sakhaline (relevées par l'URSS)
Carta 14. Derrotas en la zona de Sajalin trazadas en la URSS
Карта 14. Построенные в СССР линии пути в районе Сахалина
الحارطة (١٤): المسارات المخططة فى منطقة سخالين – اعداد الاتحاد السوفيتى

